FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

DEC 0 2 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

1:22 CV 2171

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL],

        *Plaintiff,*

    v.

[Under Seal],

        *Defendants.*

CIVIL FILE NO.: _____

**COMPLAINT**

**FILED IN CAMERA AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**<u>DO NOT SERVE</u>**

**JUDGE BRENNAN**

Magistrate Judge Armstrong

**DOCUMENT TO BE KEPT UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

FILED

DEC 0 2 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**UNITED STATES OF AMERICA,** *ex rel.*
**ALEXANDER NOVIK,**

     *Plaintiff,*

     v.

**COSMAX BTI, INC.**

&

**COSMAX, INC.**

&

**COSMAX NBT, INC.**

&

**COSMAX WEST CORP.**
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

&

**COSMAX USA, CORP. d/b/a COSMAX
USA, INC.**
c/o Business Filings Inc.
108 West 13th Street
Wilmington, DE 19801

&

**NU-WORLD CORP.**
c/o Corporation Service Company
Princeton South Corporation Center
100 Charles Ewing Boulevard, Ste. 160
Ewing, NJ 08628

&

**COSMAX NBT USA, INC.**
3350 Marquis Drive
Garland, TX 75042

&

CIVIL FILE NO.: 1:22 CV 2171

**JUDGE BRENNAN**

**QUI TAM ACTION**

**DO NOT SERVE**

**JURY TRIAL DEMANDED**

**KYUNG-SOO LEE**

**&**

**BYUNG JOO LEE,**

          *Defendants.*

---

**FILED IN CAMERA AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

---

**COMPLAINT PURSUANT TO 31 U.S.C. § 3729, *et seq.* OF THE FALSE CLAIMS ACT**

**Upon present information and belief, none of the allegations set forth in this Complaint are based on public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing audit, or investigation, or from the news media. Relator is the original source of this information.**

## <u>COMPLAINT</u>

Pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, Plaintiff-Relator Alexander Novik (hereinafter "Novik" or "Relator") by and through counsel of record, brings this Complaint, in camera and under seal, on behalf of the United States of America against Cosmax BTI, Inc. ("Cosmax BTI"); Cosmax, Inc. ("Cosmax, Inc."); Cosmax NBT, Inc. ("Cosmax NBT"); Cosmax West Corp. ("Cosmax West"); Cosmax USA, Corp. d/b/a Cosmax USA, Inc. ("Cosmax USA"); Nu-World Corp. ("NuWorld"); Cosmax NBT USA, Inc. ("Cosmax NBT USA"); Kyung-Soo Lee; and Byung Joo Lee (together, the "Individual Named Defendants") (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      Defendants, a conglomerate of Korean-based cosmetics and nutritional supplements manufacturers, fraudulently obtained $13,439,910.00 in PPP loans by concealing a vast network of at least 32 affiliated entities. Based on Defendant's fraud, the Government forgave $11,765,506.00 in principal and $158,915.72 in interest, for a total actual loss to the Government of *$11,924,421.72*, trebled to a total damage amount of *$35,773,265.16*. Defendants intentionally underrepresented their headcount by thousands, if not tens of thousands of employees.

2.      Defendants were also ineligible to receive these government backed and forgiven loans because they were engaged in an array of illegal activity—which expressly barred them from participating in the program. These illegal schemes include various forms of immigration fraud related to their US operations, such as misusing the B1 visa program, employing unauthorized temporary workers, and paying authorized spouses for the work of their unauthorized spouses.

3.      The illegal schemes also included various forms of tax fraud, such as evading federal payroll withholding taxes for South Korean nationals working in the US, evading federal income withholding taxes on taxable fringe benefits, and evading Ohio sales and use tax on employment services supplied by employment staffing companies.

4.      In sum, Defendants have schemed the system, bilking the Government out of millions intended to support small domestic businesses crippled by economic downturn.

## PARTIES

5.      The real party in interest in this *qui tam* action is the United States of America.

6.      Relator Novik has been an employee of Defendant Cosmax USA since July 2014. He initially served as the company's controller, reporting to then-CFO, Defendant Byung Joo Lee (hereinafter "BJ Lee"). At one point, Novik was the highest-ranking US employee in finance at

Cosmax USA, reporting to its then-CEO, Sok-Min Yu. In 2017, Novik was transferred into Cosmax USA's human resources (hereinafter "HR") department in the position of HR director. Novik eventually became the HR director, overseeing that department for both Cosmax USA and Defendant NuWorld. While his title was in HR, Novik remained involved in an array of business and finance matters.

7.     Defendant Cosmax BTI is a publicly traded Korean corporation established in 1992 by its CEO and Chairman, Defendant Kyung-Soo Lee (hereinafter "Chairman Lee"). Its principal location is in Seongnam, South Korea. It has four direct subsidiaries. *See* Figure 1 *infra.* Cosmax BTI is the primary parent company over all Cosmax entities (hereinafter all 32 businesses will be collectively referred to as "Cosmax").

8.     Defendant Cosmax, Inc. is the publicly traded Korean parent company over the cosmetics business lines. Cosmax, Inc. was also founded by Chairman Lee in 1992. Its principal location is in Seongnam, South Korea. It controls 20 subsidiaries, either owned directly or owned by one of two holding companies, Defendant Cosmax West and Cosmax East Co., Ltd. (hereinafter "Cosmax East"). *Id.* Cosmax, Inc., through Cosmax West, is the parent company of Cosmax USA and NuWorld. *See* Figures 1 and 2 *infra.*

9.     Defendant Cosmax NBT is the publicly traded Korean parent company over the nutritional supplements business line. It was founded in 2002, based in Seoul, South Korea. It directly controls six subsidiaries, including Defendant Cosmax NBT USA. *Id.*

10.     Cosmax West is a corporation organized and existing under the laws of the state of Delaware. It was incorporated in 2017 as a holding company for Cosmax USA and, later, NuWorld. *Id.* It has a registered agent for service, Corporation Service Company, located at 251 Little Falls Drive, Wilmington, DE 19808. Its principal place of business is 105 Challenger Road,

8th Floor, Ridgefield Park, NJ 07660. BJ Lee is its President and CEO. Based on Relator's understanding of the company, it has no other employees and is merely a holding company.

11.     Cosmax USA is a corporation organized and existing under the laws of the state of Delaware. It has a registered agent for service, Business Filings Inc., located at 108 West 13th Street, Wilmington, DE 19801. Its principal place of business is 30701 Carter Street, Solon, OH 44139. Cosmax USA was founded in 2013 and operates in the cosmetics business line.

12.     NuWorld is a corporation organized and existing under the laws of the state of New Jersey. It was founded in 1991 and later acquired by Cosmax, Inc. It was subsequently transferred to one of Cosmax, Inc.'s holding companies, Cosmax West. It has a registered agent for service, Corporation Service Company, located at Princeton South Corporation Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, NJ 08628. Its principal place of business is 300 Milik Street, Carteret, NJ 07008. NuWorld operates in the cosmetics business line.

13.     Cosmax NBT USA is a corporation organized and existing under the laws of the state of Texas. Its principal place of business is 3350 Marquis Drive, Garland, TX 75042. Cosmax NBT USA was formed in 2015 as a subsidiary of Cosmax NBT Cosmax NBT USA is in the nutritional supplements business line.

14.     On paper, Chairman Lee heads and is the majority owner of Cosmax BTI and Cosmax, Inc.; however, in actuality, he closely manages and controls all 32 Cosmax entities. Chairman Lee is a citizen of South Korea.

15.     BJ Lee is the son of Chairman Lee and oversees all the business' US operations as President and CEO of Cosmax West. He has previously held a variety of positions across Cosmax's US entities, including CFO of Cosmax USA, CEO of Cosmax NBT USA, and CEO of Cosmax USA. BJ Lee oversaw the US entities' PPP loan applications and forgiveness processes, with

Relator reporting directly to BJ Lee on these issues. BJ Lee is believed to be a resident of the state of New Jersey.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

17.     Although the issue is no longer jurisdictional, the public disclosure provisions of the False Claims Act do not bar this suit. To the extent there has been a statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, the Relator is an "original source" of the information on which the Complaint is based. Relator reported the information to the Government before any public disclosure of the allegations or transactions, has information that is independent of the public disclosure, and that information materially adds to any information the Government may have.

18.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide services of process and because Defendants have minimum contacts with the United States.

19.     Moreover, pursuant to 31 § 3732(a), "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3279 occurred." Defendants can be found in, reside, transact, and/or have transacted business in the Northern District of Ohio.

20.     Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because one or more Defendants can be found and/or have transacted business in this district.

## COMPLIANCE WITH QUI TAM FILING REQUIREMENTS

21.     Pursuant to 31 U.S.C. § 3730(b)(2), this action is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders.

22.     The United States of America, acting by and through the Department of Justice, may elect to intervene and proceed with this action, within a period of sixty (60) days, after it has received both the Complaint and information, including a written disclosure of substantially all material evidence, relating to the instant action.

## COMPLIANCE WITH FED. R. CIV. P. 9(b)

23.     Certain documentary evidence necessary to prove the allegations in this Complaint is in the exclusive possession of either the Defendants and/or the United States.

24.     With respect to each allegation herein made upon information and belief, Relator has, based on his personal knowledge, data, and experience, a reasoned factual basis to make these allegations, but he may lack complete details and/or documents that are within the possession of the Defendants and/or the United States.

25.     Relator is familiar with the policies and practices alleged herein as a result of his business dealings with Defendants and personal observations of the Defendants' schemes.

26.     Relator may not have access to all of the information regarding the schemes created and perpetuated by Defendants as some information is in the exclusive possession and control of the Defendants, and/or the United States.

8

27.     As described herein, Defendants have caused to be submitted and, on information and belief, continue to cause submission of false and fraudulent claims to government programs for payment of items and/or services described herein.

## APPLICABLE LAW AND REGULATORY BACKGROUND

### *The Federal False Claims Act*

28.     The federal False Claims Act (the "FCA" or the "Act") originally was enacted in 1863, during the Civil War. Congress substantially amended the Act in 1986 and, again, in 2009 and 2010, to enhance the Government's ability to recover losses sustained as a result of fraud against it. The Act was amended after Congress characterized it as the primary tool for combating fraud, in need of modernization. Congress crafted the amendments to incentivize individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources towards prosecuting fraud on the Government's behalf.

29.     The FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval and knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)–(B). The Act further prohibits concealing or avoiding an obligation to pay the Government, including obligations to repay the Government. 31 U.S.C. § 3729(a)(1)(G). Conspiracy to commit any of the foregoing is also prohibited. 31 U.S.C. § 3729(a)(1)(C). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1). The civil penalties are statutorily set between $5,000 and $10,000 for each violation, adjusted by the Federal Civil

Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890 (1990), and currently sit between $12,537 to $25,076.

30.     For purposes of the FCA, a person acts "knowingly" if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof that a defendant specifically intended to commit fraud. 31 U.S.C. § 3729(b)(1)(B).

31.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. 31 U.S.C. §§ 3730(b)(1) and 3730(d). Such an action is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant(s) during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. 31 U.S.C. § 3730(b)(2).

32.     The FCA also provides protections from retaliation for private entities and individuals, such as relators, who come forward with violations of the FCA. 31 U.S.C. § 3730(h).

### *Coronavirus Aid, Relief, and Economic Security Act and the Paycheck Protection Program*

33.     The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted on March 27, 2020, in response to the COVID-19 pandemic and its impact on the economy, individuals, and businesses. CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

34.     One source of relief provided by the CARES Act was the Paycheck Protection Program ("PPP"), which gave financial assistance to small businesses for certain costs, such as payroll. *Id.* at 287; *see also* 15 U.S.C. § 636(a)(36)(F)(i). PPP provided $349 billion in fully

guaranteed SBA loans. The SBA launched the program on April 3, 2020. *See* OFF. OF INSPECTOR GEN., REP. 20-14, FLASH REPORT SMALL BUSINESS ADMINISTRATION'S IMPLEMENTATION OF THE PAYCHECK PROTECTION PROGRAM REQUIREMENTS (2020). By April 16, 2020, PPP lenders approved more than 1,661,000 loans totaling almost $342.3 billion. *Id.*

35.     Over the ensuing month, PPP was repeatedly extended and infused with additional funding.  On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, providing an additional $310 billion in funding. Pub. L. No.116-139, § 102, 134 Stat 620 (2020). On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act extended the program through March 31, 2021, and provided an additional $147.5 billion in funding. Pub. L. No. 116-260, § 323, 134 Stat. 1993, 2019 (2020).

36.     On March 11, 2021, the American Rescue Act of 2021 provided the PPP with another $7.2 billion. This brought the total PPP funding to $813.7 billion. Pub. L. No. 117-2, § 5001, 135 Stat. 4, 85 (2021).

37.     The loan's purpose was to provide a direct incentive for small businesses to keep their workers on payroll. Payroll costs included the sum of payments of salary, wage, or commission, paid leave, and payment for benefits and state and local tax. 15 U.S.C. § 636(a)(36)(A)(viii)(I). These funds could also be used for interest payments on mortgages, rent, and utilities. 15 U.S.C. § 636(a)(36)(F)(i)(IV)–(VI).

*Eligibility for PPP Loans*

38.     An eligible business "employs not more than the greater of," 500 employees, or "if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern . . . operates." 15 U.S.C § 636(a)(36)(D)(i). The borrowers were also required to make certain certifications, including certifying in good faith that the loan was

11

necessary to support the operations of the recipient due to the then-current economic conditions. 15 U.S.C § 636(a)(36)(G)(i).

39.     While PPP loans were guaranteed under similar terms, conditions, and processes as traditional SBA 7(a) loans, certain terms were unique to PPP. Collateral and personal guarantees were not required. 15 U.S.C § 636(a)(36)(J). All loans were to be processed by private lenders under delegated authority, and lenders were permitted to rely on certifications of the borrower to determine borrower eligibility and use of loan proceeds. 15 U.S.C § 636(a)(36)(F)(ii)(I)–(II). There were no fees collected by the administrator of the loan. 15 U.S.C § 636(a)(36)(H).

40.     There were two rounds of PPP loans. The first draw's eligibility was slightly broader than the second. In the first draw, qualifying businesses were only required to have 500 or fewer employees, or an industry specific employee cap. 15 U.S.C § 636(a)(36)(D)(i).

41.     The second draw had the same general loan terms as the first draw. However, the second draw placed stricter limitations on the number of employees. 15 U.S.C. § 636(a)(37); *see generally*, SMALL BUS. ADMIN., SECOND DRAW PPP LOAN (2022). To qualify for the second draw, the businesses were required to have (1) previously received the first draw PPP loan and have used (or planned to use) the full amount only for authorized uses, (2) no more than 300 employees, and (3) demonstrated at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. 15 U.S.C. § 636(a)(37)(A)(iv)(I). The second draw also expanded the uses of the loan. The loan could be used for worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism in 2020, certain supplier costs, and expenses for operations. 15 U.S.C. §§ 636(a)(37)(A)(iii) (citing definitions in 15 U.S.C. § 636m(a)) and § 636(a)(37)(J)(iii). These fund uses were in addition to the uses laid out in the first draw.

42.     Under the CARES Act, SBA delegated authority to lenders to make and approve PPP loans. 15 U.S.C. § 636(a)(36)(F)(ii)(I). To approve the loans, the lenders confirmed (1) receipt of borrower certifications in the PPP Borrower Application, (2) receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes, and (3) the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application. 85 Fed. Reg. 20815 (April 15, 2020) (to be codified in 13 C.F.R. pt. 120).

43.     Once the above steps were completed, the lender submitted the application information to the SBA electronically to obtain a loan number. 86 Fed. Reg. 3692, 3709(C)(9) (Jan. 14, 2021). After this, the lender notified the SBA of the loan disbursement by completing the SBA Form 1502 with loan status information. *Id.* at (C)(10); *see* Off. of Fin. Program Operations, SBA FORM 1502 AND INSTRUCTIONS.

44.     If the loans were used for unauthorized purposes, the SBA required the borrower to repay those amounts. If the funds were knowingly used for unauthorized purposes, the borrower was subject to additional liability, including civil or criminal fraud charges.

45.     The PPP was attractive to businesses (and likewise susceptible to rampant fraud) because the PPP offered full loan forgiveness if certain conditions were met.

46.     Under the first draw, a business was eligible to qualify for full loan forgiveness if the loan proceeds were spent on payroll costs and other eligible expenses, 15 U.S.C. § 636m(b), employee and compensation levels were maintained, § 636m(d)(2), and at least 60% of the proceeds were spent on payroll costs. § 636m (d)(8); *see generally* SMALL BUS. ADMIN., PPP LOAN FORGIVENESS (2022).

47.     Under the second draw, forgiveness requirements largely mirrored the first draw. 15 U.S.C. § 636(a)(37)(J)(ii).

48.     Once the borrower submitted the PPP Loan Forgiveness Application to its lender, the lender had 60 days to review and issue a decision to the SBA. 15 U.S.C. § 636m(g). If the lender decided the borrower was entitled to loan forgiveness, the lender requested payment from the SBA, which then remitted the appropriate forgiveness amount to the lender no later than 90 days after receiving lender's decision. 15 U.S.C. § 636m(c)(3). Borrowers were responsible for any remaining balance left unforgiven. *See* 15 U.S.C. § 636(a)(36)(K)–(M).

## FACTUAL BACKGROUND

49.     Defendants fraudulently obtained $13,439,910.00 in PPP loans by knowingly concealing from the United States the affiliation of 32 entities. In so doing, Defendants underrepresented their headcount by thousands, if not tens of thousands of employees. Defendants were also ineligible to receive these government backed loans because they were engaged in an array of illegal activity. These illegal schemes included various forms of immigration fraud related to their US operations, such as misusing the B1 visa program, employing unauthorized temporary workers, and paying authorized spouses for the work of their unauthorized spouses. The illegal schemes also included various forms of tax fraud, such as evading federal payroll withholding taxes for South Korean nationals working in the US, evading federal income withholding taxes on taxable fringe benefits, and evading Ohio sales and use tax on employment services supplied by employment staffing companies.

### *Defendants Submitted Fraudulent PPP Applications Flouting Affiliation Rules*

50.     The Lee family operates a vast network of cosmetics and nutritional supplements companies across North America and the Pacific. Beneath a complex web of sibling and parent

14

companies, ownership of this network traces back to the Lee family. The Lee family closely holds control of this network, with Chairman Lee and Chairlady Suh at its head, and their two sons overseeing the US and Pacific wings respectively.

51.    Despite the clear interconnectedness of these entities, which rendered Defendants ineligible for PPP loans, Defendants repeatedly ignored the PPP's foreign-affiliate regulations and drastically underrepresented the number of employees across entities. By concealing the extent of their foreign affiliates, they were able to obtain millions in PPP loans. Defendants were well aware of the need to include their myriad of foreign entities in headcounts for their PPP applications but avoided that obligation to obtain millions of US government dollars.

### _Companies Applying for PPP Loans Must Certify Their Eligibility, Counting Both Their Employees and Those of All Domestic and Foreign Affiliates_

52.    To qualify for PPP funds, a business must "employ[] not more than the greater of," 500 employees, or "if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern . . . operates." 15 U.S.C. § 636(a)(36)(D)(i)(I)–(II).

53.    Employees, for purposes of determining a headcount include "individuals employed on a full-time, part-time, or other basis." 15 U.S.C. § 636(a)(36)(D)(v); 13 C.F.R. § 121.106(a). "This includes employees obtained from a temporary employee agency." 13 C.F.R. § 121.106(a).

54.    A borrower must calculate the total number of employees for purposes of eligibility. _See_ 15 U.S.C. § 636(a)(36)(D)(i).

55.    When calculating the number of employees for determining PPP eligibility, the business entity must count, not only its own employees, but those of "**_all of its domestic and foreign affiliates_**." 13 C.F.R. § 121.103(a)(6) (emphasis added). An entity over its employee cap,

15

including both domestic and foreign affiliate employees, is ineligible for the PPP loan. 85 Fed. Reg. 30835 (May 21, 2020). However, if an entity did not include foreign employees in the employee headcount, the SBA would not deem the entity ineligible for a PPP loan if (1) the entity filed before May 5, 2020, and (2) had less than 500 employees whose principal place of residence was the United States. *Id.*

56.     PPP's affiliation rules were applicable to all participants. *See* 13 C.F.R. § 121.103. Under the general principles, entities are considered affiliated if one entity controls or has the power to control the other entity. 13 C.F.R. § 121.103(a)(1). This provision also applies when a third party controls two or more entities. *Id.* Whether this control is in fact exercised is irrelevant, the mere *existence* of control is operative. *Id.* Indirect control of an entity through a third party may also be deemed affiliation. 13 C.F.R. § 121.103(a)(4). The SBA will look at the "totality of the circumstances," and may determine that an affiliation exists even when no single factor is fully satisfied. 13 C.F.R. § 121.103(a)(5).

57.     The SBA has multiple tests that are used to determine affiliation. 13 C.F.R. § 121.103(c)–(g). The tests include (1) affiliation based on stock ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on common management; (4) affiliation based on identity of interest; and (5) affiliation based on the newly organized concern. 13 C.F.R. § 121.103(c)–(g).

58.     Relevant here, affiliation based on stock ownership arises where an individual or entity owns, controls, or has the power to control 50% or more of the concern's voting equity. 13 C.F.R. § 121.103(c)(1). Such a majority owner is deemed to control the entity. *Id.* A presumption of control may also arise where two or more minority owners (individuals or entities) each owns, controls, or has the power to control minority holdings that are equal or approximately equal in

size, and the aggregate of these minority holdings is large as compared with any other stock holding. 13 C.F.R. § 121.103(c)(2). If no individual or entity is determined to control, the SBA will deem the Board of Directors and CEO or President to be in control of the business. 13 C.F.R. § 121.103(c)(3).

59.     Also relevant here, affiliation based on "identity of interest" arises between "individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships)." 13 C.F.R. § 121.103(f). Specifically, entities owned by married couples, parents, siblings, and children "are presumed to be affiliated with each other if they conduct business with each other." 13 C.F.R. § 121.103(f)(1). Conducting business with each other includes joint ventures or sharing or providing loans, resources, equipment, locations or employees with one another. *Id.*

60.     Again, the SBA determines the size of a business by counting its "employees . . . *and all of its domestic and foreign affiliates,*" 13 C.F.R. § 121.103(a)(6) (emphasis added), including temporary employees. 13 C.F.R. § 121.106(a).

### *Cosmax's US Entities Fraudulently Applied for and Received PPP Loans Without Full Disclosure of Their Foreign Affiliates*

61.     The three US entities collectively submitted four applications for PPP loans, improperly obtaining a total of **$13,439,910.00** from the Government.

62.     On April 14, 2020, Cosmax NBT USA received approval for $1,418,800.00 in PPP funds (hereinafter "NBT USA Loan"). Relator believes that BJ Lee was responsible for overseeing this initial application. While there was passive participation by corporate counsel Allyn Langford, Defendants intentionally held back information, which prevented Langford from providing adequate counsel.

63.     After Cosmax NBT USA received approval for this initial loan, BJ Lee directed Relator to apply for the other two US entities.

64.     On April 28, 2020, NuWorld received approval for $5,249,510.00 in PPP funds (hereinafter "NuWorld loan").

65.     On May 1, 2020, Cosmax USA received approval for $4,771,600.00 in PPP funds (hereinafter "first Cosmax USA loan").

66.     Finally, on March 28, 2021, Cosmax USA received approval for an additional $2,000,000.00 in PPP funds (hereinafter "second Cosmax USA loan").

67.     Below is a chart containing the loan applications at issue.

| Loan | Approval Date | Loan Amount | Forgiveness Date | Principal Forgiven | Interest Forgiven |
|------|---------------|-------------|------------------|--------------------|--------------------|
| Cosmax NBT USA | 04/14/2020 | $1,418,800.00 | Unknown | $1,418,800.00 | $17,893.00 |
| NuWorld | 04/28/2020 | $5,249,510.00 | 09/09/2021 | $5,249,510.00 | $70,722.57 |
| 1st Cosmax USA | 05/01/2020 | $4,771,600.00 | 10/27/2021 | $3,097,196.00 | $45,855.71 |
| 2nd Cosmax USA | 03/28/2021 | $2,000,000.00 | 06/13/2022 | $2,000,000.00 | $24,444.44 |
| | | $13,439,910.00 | | $11,765,506.00 | $158,915.72 |

68.     At all times, senior management directed efforts to obtain PPP loans. This direction came from the highest level: Chairman Lee acting through BJ Lee. Senior oversight dates back to the beginning of Defendants' application process.

69.     On April 9, 2020, Relator received a text message from BJ saying, "please let me know the status of applying the loan for Cateret (sic) [NuWorld]. I got a call from Chairman Lee last night, asking me about the status."

70.     As part of the PPP application process, companies are required to disclose all their affiliates. Specifically, question three of the PPP application asks, "[i]s the Applicant or any owner

of the Applicant an owner of any other business, or have common management with, any other business?"

71.     This reporting requirement also includes SBA Form 3511, a worksheet that must be completed when a borrower's loan application indicates that it may have affiliate entities. It requires the disclosure of all the borrower's affiliates and directs the borrower to the relevant regulatory guidelines in 13 C.F.R. § 121.103.

72.     Once completed, the borrower submitted Form 3511 to its loan servicer, who in turn submitted the information to the SBA's PPP forgiveness platform. The borrower's submission in Form 3511 allowed the SBA "to evaluate the borrower's certification on its PPP Loan Application that it was eligible to receive a PPP loan[.]"

73.     Failure to disclose affiliates had an impact on the SBA's determination on loan eligibility, loan amount, and forgiveness.

74.     Here, Defendants either woefully underrepresented their affiliates or blatantly failed to disclose any affiliates in their PPP applications. When applying for the NuWorld loan and both Cosmax USA loans, for example, Defendants answered question three in the negative, failing to disclose affiliates.

75.     While all three applications disclosed that they were owned by Cosmax West, neither NuWorld nor Cosmax USA disclosed the existence of the other entity in their loan applications.

76.     As part of the forgiveness process, NuWorld subsequently submitted Form 3511. While NuWorld did disclose that it was affiliated with Cosmax USA by virtue of their common ownership in that form, it failed to disclose the larger networks of companies connected to its parent company.

77.     Although Relator was not involved in the PPP process with Cosmax NBT USA, upon information and belief, similar misrepresentations were made in its application with regard to affiliates.

78.     For this reason alone, all four Cosmax PPP applications contained material omissions and false claims. As discussed in the next section, these certifications were not only false, but they significantly misrepresented the overall corporate structure of defendants.

### *Cosmax is Comprised of a Host of Entities All Under Ownership Control of Its Korean Parent Companies*

79.     The Lees' vast network of corporate entities goes well beyond the six corporate Defendants identified in this disclosure. All told, the family's corporate web is comprised of at least 32 entities that are all under common control.[1]

80.     Of the five SBA affiliation tests referenced above, ownership-control is the most straightforward—finding control where an entity owns half or more of another. This simple test is enough to establish three distinct trees of control, one under each of the named Korean parent companies.

81.     The three US entities that illegally received PPP funding sit in the two largest control trees: that of Cosmax, Inc. and Cosmax NBT.

82.     While the vast employee counts of these two trees is enough to exceed applicable headcount thresholds on their own, as discussed in later sections, another control test shows that all three trees are in fact connected at the root, resulting in a complete control network of at least 32 entities.

---

[1] *See* Figure 1 *infra*.

83.     The largest ownership-control tree extends from Cosmax, Inc.[2] Under this one parent, 20 other entities sit, including two of the US entities, Cosmax USA and NuWorld, as well as perhaps the largest company by number of employees, Cosmax China, Inc. (hereinafter "Cosmax China").[3]

84.     Cosmax, Inc. owns 50% or more of the stock in each of these companies,[4] making all the entities affiliates for the purposes of PPP.

85.     The degree of ownership-control is by no means a close-run issue. Defendants did not accidentally overlook this fact or make a mistake in their disclosures because of wide fluctuations caused by acquisitions, investments, or divestments.

86.     Half of the affiliates at issue are owned outright by Cosmax, Inc. directly or owned outright by one of its two holding companies, Cosmax West and Cosmax East.[5]

87.     Moreover, Cosmax, Inc. or one of its two holding companies hold an interest of 90% or more in 14 of the 20 companies.[6] And Cosmax, Inc.'s ownership interest in these 20 entities has not fluctuated over the course of the relevant timeframe.[7]

---

[2] *See* Figure 1 *infra.*
[3] *See id.*
[4] *See* Figure 2 *infra.*
[5] *See id.* Cosmax, Inc. directly holds 100% interest in Cosmax.Lab Co., Ltd., Cosmax Laboratories Co., Ltd., Cosmax Japan, Inc., and Mad Square Co., Ltd. NuWorld is owned outright by Cosmax West. Cosmax East holds 100% interest in Cosmax Guangzhou, Inc., Cosmax China International, Inc., Cosmax (Shanghai) Trade, Inc., Cosmax Shanghai Testing Technology Co., Ltd., and 3 Apples Cosmetics, Inc. (China).
[6] *See id.* In addition to the ten companies listed in the preceding note, Cosmax, Inc. or one of its holding companies holds an interest of 90% or more in Cosmax East, Cosmax China, PT, Cosmax Indonesia, and Agricultural Corporation Cosmax Hyangyakwon Co., Ltd. Of note, Cosmax, Inc. owns 99.25% of PT Cosmax Indonesia, with the remaining shares being owned by Cosmax, BTI, Inc.
[7] *See id.*

88.     The second largest ownership-control tree extends from Cosmax NBT.[8] Cosmax NBT has ownership-control over six other entities, including the final PPP recipient, Cosmax NBT USA.[9]

89.     As with the Cosmax, Inc. control tree, Cosmax NBT's ownership-control is overt. Cosmax NBT owns four of its six subsidiaries outright.[10] Again, Defendants were well aware that they had ownership-control over these subsidiaries.

90.     Like the other two South Korean parent companies, Cosmax BTI has ownership-control over its own subsidiaries, four in total.[11] Again, half are owned outright by their parent, making corporate knowledge of ownership-control clear.[12]

91.     While Cosmax BTI itself does not have ownership-control over any of the PPP recipients, its employees and those of its subsidiaries are nonetheless plainly relevant.

92.     As discussed in the following section, another SBA control test demonstrates that this complex web of Cosmax entities is not three standalone chains of affiliates, but rather is one unified group of 32 affiliated entities for the purposes of PPP headcount.

**[Remainder of Page Intentionally Blank]**

---

[8] *See* Figure 1 *infra.*
[9] *See* Figures 1 and 2 *infra.*
[10] *See* Figure 2 *infra.* Cosmax NBT has full ownership of Cosmax NBT USA, Cosmax NBT Australia Pty. Ltd., Cosmax NBT China Co., Ltd., and Cosmax NBT Singapore Pte. Ltd.
[11] *See* Figure 1 *infra.*
[12] *See* Figure 2 *infra.* Cosmax BTI has full ownership interest in Cosmax Biotech Co., Ltd. and Cosmax Shanghai TSM, Inc.

# Figure 1



**Figure 2**

| Owner | Percent | Date |
|---|---|---|
| **Cosmax BTI, Inc.** | | |
| Kyung-Soo Lee | 60.56% | FYE 2019 |
| Kyung-Soo Lee | 61.04% | FYE 2020 |
| Kyung-Soo Lee | 61.04% | FYE 2021 |
| **Cosmax NBT, Inc.** | | |
| Cosmax BTI, Inc. | 38.17% | FYE 2019 |
| Cosmax BTI, Inc. | 38.17% | FYE 2020 |
| Cosmax BTI, Inc. | 38.17% | FYE 2021 |
| **Cosmax, Inc.** | | |
| Cosmax BTI, Inc. | 26.24% | FYE 2019 |
| Cosmax BTI, Inc. | 26.24% | FYE 2020 |
| Cosmax BTI, Inc. | 25.85% | FYE 2021 |
| **Cosmax West Corp.** | | |
| Cosmax NBT, Inc. | 3.33% | FYE 2019 |
| Kyung-Soo Lee | 46.67% | FYE 2019 |
| Cosmax, Inc. | 50.00% | FYE 2019 |
| Cosmax NBT, Inc. | 3.33% | FYE 2020 |
| Kyung-Soo Lee | 46.67% | FYE 2020 |
| Cosmax, Inc. | 50.00% | FYE 2020 |
| Cosmax NBT, Inc. | 3.33% | FYE 2021 |
| Kyung-Soo Lee | 46.67% | FYE 2021 |
| Cosmax, Inc. | 50.00% | FYE 2021 |
| **Cosmax USA, Inc.** | | |
| Cosmax, Inc. | 80% | 2013–17 |
| BJ Lee | 20% | 2013–17 |
| Cosmax West Corp. | 80% | 2017–Present |
| BJ Lee | 20% | 2017–Present |
| **NuWorld Corp.** | | |
| Cosmax West Corp. | 100% | N/A |
| **Cosmax NBT USA, Inc.** | | |
| Cosmax NBT, Inc. | 100% | FYE 2019 |
| Cosmax NBT, Inc. | 100% | FYE 2020 |
| Cosmax NBT, Inc. | 100% | FYE 2021 |
| **Cosmax East Co., Ltd.** | | |
| Cosmax, Inc. | 90% | FYE 2019 |
| Cosmax, Inc. | 90% | FYE 2020 |
| Cosmax, Inc. | 90% | FYE 2021 |
| **PT Cosmax Indonesia** | | |
| Cosmax, Inc. | 99.25% | FYE 2019 |
| Cosmax BTI, Inc. | 0.75% | FYE 2019 |
| Cosmax, Inc. | 99.25% | FYE 2020 |
| Cosmax BTI, Inc. | 0.75% | FYE 2020 |
| Cosmax, Inc. | 99.25% | FYE 2021 |
| Cosmax BTI, Inc. | 0.75% | FYE 2021 |

# Figure 2

| Cosmax Thailand Co., Ltd. | | |
|---|---|---|
| Cosmax, Inc. | 86.40% | FYE 2019 |
| Cosmax, Inc. | 86.40% | FYE 2020 |
| Cosmax, Inc. | 86.40% | FYE 2021 |
| **Cosmax iCure Co., Ltd.** | | |
| Cosmax, Inc. | 51% | FYE 2019 |
| Cosmax, Inc. | 51% | FYE 2020 |
| Cosmax, Inc. | 51% | FYE 2021 |
| **Cosmax.Lab Co., Ltd.** | | |
| Cosmax, Inc. | 100% | FYE 2019 |
| Cosmax, Inc. | 100% | FYE 2020 |
| Cosmax, Inc. | 100% | FYE 2021 |
| **CM Tech** | | |
| Cosmax, Inc. | 51% | FYE 2019 |
| Cosmax, Inc. | 51% | FYE 2020 |
| Cosmax, Inc. | 51% | FYE 2021 |
| **Agricultural Corporation Cosmax Hyangyakwon Co., Ltd.** | | |
| Cosmax, Inc. | 90% | FYE 2019 |
| Cosmax, Inc. | 90% | FYE 2020 |
| Cosmax, Inc. | 90% | FYE 2021 |
| **3 Apples Cosmetics Co., Ltd. (Korea)** | | |
| Cosmax, Inc. | 51% | FYE 2019 |
| Cosmax, Inc. | 51% | FYE 2020 |
| Cosmax, Inc. | 51% | FYE 2021 |
| **Cosmax Laboratories Co., Ltd.** | | |
| Cosmax, Inc. | 100% | FYE 2020 |
| Cosmax, Inc. | 100% | FYE 2021 |
| **Cosmax Japan, Inc.** | | |
| Cosmax, Inc. | 100% | FYE 2021 |
| **Mad Square Co., Ltd.** | | |
| Cosmax, Inc. | 100% | FYE 2021 |
| **Cosmax China, Inc.** | | |
| Cosmax East Co., Ltd. | > 50% | FYE 2019 |
| Cosmax East Co., Ltd. | 90% | FYE 2020 |
| Cosmax East Co., Ltd. | 97.45% | FYE 2021 |
| **Cosmax NBT Australia Pty. Ltd.** | | |
| Cosmax NBT, Inc. | 100% | FYE 2019 |
| Cosmax NBT, Inc. | 100% | FYE 2020 |
| Cosmax NBT, Inc. | 100% | FYE 2021 |
| **Cosmax NBT China Co., Ltd.** | | |
| Cosmax NBT, Inc. | 100% | FYE 2019 |
| **Cosmax NS, Inc. (Cosmax NS Co., Ltd.)** | | |
| Cosmax NBT, Inc. | 54% | FYE 2019 |
| Cosmax NBT, Inc. | 54% | FYE 2020 |
| Cosmax NBT, Inc. | 54% | FYE 2021 |

**Figure 2**

| Dr. D&A | | |
|---|---|---|
| Cosmax NBT, Inc. | 40.57% | FYE 2019 |
| Cosmax NBT, Inc. | 80.46% | FYE 2020 |
| Cosmax NBT, Inc. | 80.46% | FYE 2021 |
| **Cosmax NBT Singapore Pte. Ltd.** | | |
| Cosmax NBT, Inc. | 100% | FYE 2019 |
| Cosmax NBT, Inc. | 100% | FYE 2020 |
| Cosmax NBT, Inc. | 100% | FYE 2021 |
| **Cosmax Bio Co., Ltd.** | | |
| Cosmax BTI, Inc. | 64.76% | FYE 2019 |
| Cosmax BTI, Inc. | 67.62% | FYE 2020 |
| Cosmax BTI, Inc. | 67.62% | FYE 2021 |
| **Cosmax Biotech Co., Ltd.** | | |
| Cosmax BTI, Inc. | 100% | FYE 2019 |
| Cosmax BTI, Inc. | 100% | FYE 2020 |
| Cosmax BTI, Inc. | 100% | FYE 2021 |
| **Cosmax Shanghai TSM, Inc.** | | |
| Cosmax BTI, Inc. | 100% | FYE 2019 |
| Cosmax BTI, Inc. | 100% | FYE 2020 |
| Cosmax BTI, Inc. | 100% | FYE 2021 |
| **Cosmax Pharma Co., Ltd.** | | |
| Cosmax BTI, Inc. | 55.30% | FYE 2019 |
| Cosmax BTI, Inc. | 55.12% | FYE 2020 |
| Cosmax BTI, Inc. | 55.12% | FYE 2021 |
| **Cosmax Guangzhou, Inc.** | | |
| Cosmax East Co., Ltd. | 100% | FYE 2021 |
| **Cosmax China International, Inc.** | | |
| Cosmax East Co., Ltd. | 100% | FYE 2021 |
| **Cosmax (Shanghai) Trade, Inc.** | | |
| Cosmax East Co., Ltd. | 100% | FYE 2021 |
| **Cosmax Shanghai Testing Technology Co., Ltd.** | | |
| Cosmax East Co., Ltd. | 100% | FYE 2021 |
| **3 Apples Cosmetics, Inc. (China)** | | |
| Cosmax East Co., Ltd. | 100% | FYE 2021 |

[Remainder of Page Intentionally Blank]

*Under the SBA's Identity of Interest Control Test, All Cosmax Entities Act as a Single Unified Entity*

93.     Delving further into the convoluted interaction between the various Cosmax entities, it becomes clear that this is truly a monolith entity, rather than 32 distinct entities under three unrelated parent companies.

94.     All entities—regardless of their parent company—share resources and liabilities.

95.     Employees are routinely used across entities.

96.     Chairman Lee—the entities' omnipresent patriarch—wields power and directs even the most minute issues, such as routine hiring for mid-level employees at US affiliates. Through his two sons, overseeing the US and Pacific operations respectively, Chairman Lee exerts unified control across all entities. Cosmax bills itself as a single enterprise under the vision of Chairman Lee.

97.     Affiliation based on identity of interest arises between "individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships)." 13 C.F.R. § 121.103(f).

98.     Specifically, entities owned or controlled by married couples, parents, siblings, and children "are presumed to be affiliated with each other if they conduct business with each other." 13 C.F.R. § 121.103(f)(1). Conducting business with each other includes joint ventures or sharing or providing loans, resources, equipment, locations or employees with one another. *Id.*

99.     This presumption can be rebutted "by showing a clear line of fracture between the concerns." *Id.*

100.    Presumptions can also arise under economic dependence, where an entity derived 70% or more of its receipts from another entity over three consecutive fiscal years. 13 C.F.R.

§ 121.103(f)(2). The economic dependence presumption is rebutted where the dependent entity is not solely dependent on the other entity. 13 C.F.R. § 121.103(f)(2)(i).

101.    Cosmax operates as a unified entity. It even speaks of itself in these terms:

> COSMAX *Group* is a global no.1 research, development and production *business group* for cosmetic and health functional food products. . . . COSMAX *Group*, built around the global leader of K-Beauty, COSMAX, consists of COSMAX NBT and COSMAX BIO. . . . *[W]e are interwoven* and focused through each field and integration. . . . From planning, research and development of cosmetics, to health functional foods production, quality control and marketing support, the *COSMAX Group moves forward, shoulder to shoulder*, beside wide range of partners in global markets. Chairman Lee is the leader of COSMAX who has steered COSMAX through its 27-year history, since he founded the company in 1992.[13]

102.    In its own terms, there is no "clear line of fracture" between Korean parent companies. There is no fracture between the cosmetics businesses or the nutritional supplements businesses. And there is no fracture between parents and subsidiaries. Cosmax is one group under the singular authority of Chairman Lee.

103.    Defendants routinely use the funds of one entity to prop up another. Often, these economic dependencies crossover the three ownership-control trees outlined in the prior section. The South Korean parent companies' annual corporate filings detail various financial dealings with related parties, including sales, purchases, income, expenses, receivables, liabilities, and borrowing. Below are just some examples of the companies conducting business with each other:

  a.  In fiscal year 2020, Cosmax, Inc. provided several loan guarantees to related entities. In addition to numerous guarantees for its own subsidiaries, it also guaranteed loans for Cosmax BTI and a BTI subsidiary, Cosmax Bio Co., Ltd.

---

[13] https://cosmax.com/new/en/good/sub_good_01_group.asp (emphasis added) (last accessed 11/29/2022).

b.  In fiscal year 2019, Cosmax NBT's filings show eleven separate guarantees on behalf of Cosmax, BTI, thirteen in fiscal year 2020, and seventeen in fiscal year 2021.

c.  Cosmax BTI in turn guaranteed loans for Cosmax NBT and Cosmax NBT USA in fiscal year 2019.

d.  Cosmax NBT provided significant collateral to Cosmax West, a Cosmax, Inc. subsidiary, in fiscal years 2019, 2020, and 2021.

e.  In fiscal year 2020, Cosmax BTI reported numerous sales to Cosmax, Inc. and ten subsidiaries thereof, as well as sales to Cosmax NBT and five of its subsidiaries. These include all three US entities.

f.  Cosmax, BTI reported purchases from only three related entities in fiscal year 2020: the three US entities.

g.  Cosmax BTI lists "[s]ignificant other income and other expenses" from Cosmax, Inc. subsidiaries, Cosmax USA and NuWorld, in fiscal years 2019, 2020, and 2021.

104.  Similar financial dealing, including sales, purchases, income, expenses, receivables, liabilities, and borrowing, across entities and parent groups can be seen in fiscal years 2019 to 2021 for all three Korean parent companies.

105.  In their own filings, which meticulously report interactions between "related entities," Defendants demonstrate their own understanding that Cosmax is a unified venture with an identity of interest. These filings paint a clear picture of Defendants sharing "identical or substantially identical business or economic interests," within the meaning of 13 C.F.R. § 121.103(f).

106.    Relator has personal knowledge of major financial support by Cosmax, Inc. to Cosmax USA.

107.    In 2013, Cosmax, Inc. guaranteed a $20,000,000.00 loan to Cosmax USA.

108.    In 2014, Cosmax, Inc. guaranteed another $15,000,000.00 loan to Cosmax USA.

109.    The same year, Cosmax USA received an additional $5,000,000.00 loan, again guaranteed by Cosmax, Inc.

110.    Cosmax, Inc. continues to sustain Cosmax USA through large cash infusions.

111.    Upon information and belief, Cosmax USA's dependence on its parent company is emblematic of the financial dependencies across Cosmax entities.

112.    This internal financial support not only shows affiliation between the entities, but also undercuts Defendants' need for PPP altogether. Borrowers were required to certify in good faith their economic need for PPP loans. 15 U.S.C. § 636(a)(36)(G)(i)(I). A billion-dollar business with access to massive stores of capital across entities can hardly have a good faith basis for such applications.

113.    Defendants also routinely shared employees and other resources across entities.

114.    From his work in payroll and other HR matters, Relator has a keen view into these issues.

115.    For instance, Relator is aware that Cosmax NBT USA and NuWorld employees are on Cosmax USA's payroll, 401k plan, and health insurance, despite the fact that those companies have different parent companies and are on opposite sides of the cosmetics and nutritional supplements businesses respectively.

116.    It is common practice for Defendants to transfer employees between entities but keep them on the payroll of their previous entity-employer.

117.    Recently, Defendants moved one employee, Youngsang Choi, from Cosmax USA to take over the HR department at Cosmax NBT; however, Choi remained on the payroll of Cosmax USA.

118.    Another employee, Euitak Kim, works entirely with NuWorld as an Assistant Vice President of factory operations; despite this, Kim is also on the payroll of Cosmax USA.

119.    Similarly, many employees have job responsibilities across entities, while only being on the payroll of one entity.

120.    Relator was one such employee. While on the payroll of Cosmax USA, he oversaw all HR matters for Cosmax USA and NuWorld, including terminating and recruiting individuals for both entities.

121.    In another instance, NuWorld's General Manager, Michael Redfern, worked out of Cosmax USA's facility and oversaw plants for both Cosmax USA and NuWorld.

122.    While Relator's insight into these practices is limited to his vision from within HR at the US entities, upon information and belief, such practices occurred across all of Defendants' entities.

123.    As discussed in a later section dealing with immigration fraud issues, for example, Defendants routinely paid Korean nationals out of Korean entities while having those employees impermissibly work in the US under B1 visas.

124.    There is no divide between employees or resources across Defendants' entities, demonstrating an identity of interest.

125.    Chairman Lee controls all aspects of the organization, including the day-to-day operations, financial performance review, and employment decisions. He routinely visits the US to oversee Cosmax's operations.

31

126.    In one visit around late 2019 or early 2020, the organization was interviewing potential candidates for Cosmax USA's Research and Innovation office. On January 11, 2020, Chairman Lee and Chairlady Suh personally led an interview of a candidate, with Relator present and BJ Lee translating. Chairman Lee approved this hire, which would not have been made otherwise, but the candidate was ultimately not hired as a mutually agreed upon salary was not reached.

127.    Chairman Lee was most recently in the US around October or November 2022, meeting customers of the US entities.

128.    During his US visits, Chairman Lee spends one or two days at each site, giving speeches regarding business and strategy and meeting with US employees. He hosts employee and management meetings to discuss the past year, the future, and the market. He is treated as the boss and those within the organization recognize him as such, regardless of whether he is named as a director or owner of that specific entity.

129.    In one email sent to all NuWorld employees, NuWorld's HR Coordinator stated, "We want to inform everyone that Chairman and Chairlady will be visiting the Carteret office on Monday, January 13, 2020. Chairman Lee would like to hold an All Employee presentation with shared tele-conference between Carteret, Ridgefield Park and Solon offices."

130.    Not only did Chairman Lee present to all NuWorld employees, but also to all Cosmax USA employees, referenced as the "Ridgefield Park and Solon offices." Great efforts were taken to ensure that Chairman Lee spoke to all employees. Operations across facilities were halted for an hour and a half, with shifts being shut down early for Chairman Lee's speech. This announcement was even physically posted throughout the facility to ensure that employees without

email addresses knew to attend. Even employees who were absent were provided a remote link and directed to join.

131.    The Chairman's personal direction of all entities was by no means isolated. In another example, Cosmax USA's then-CEO, Sok-Min Yu, passed along a summary of Chairman Lee's 2017 New Year's speech after Defendants were unable to hold an "all employees meeting."

132.    Again, this summary went to all Cosmax USA and NuWorld employees. Chairman Lee outlined profitability across "Cosmax group," with details on growth in its Korean and Chinese operations and set revenue goals across all entities. Chairman Lee repeatedly acted as the leader of all entities, directing overall business strategy and growth.

133.    Chairman Lee closely oversaw the profitability of all entities. In one email exchange, BJ Lee directed Relator to pass along insurance renewal information to Cosmax USA's CFO, YoungBum Kim (hereinafter "YB Kim"), "as he is preparing for 2020 business plan report that will be presented to Chairman Lee."

134.    Chairman Lee's oversight ran the gamut of corporate governance, from large scale management to minutia. In another email, Sok-Min Yu directed Relator to change BJ Lee's compensation, saying, "On behalf of Chairman Lee, pls modify the BJ's housing allowance from $7,000 to $7,500 per month. There was mis-calculation (sic) and this is right amount. We found after review of his contract."

135.    From directing global business strategy to reviewing employee contracts for miscalculations in compensation, Chairman Lee exerted complete control over all Cosmax entities.

136.    Chairlady Suh is also very involved in the overall management of Cosmax. While Relator is unsure of all her specific responsibilities, upon information and belief, she plays a key role in all personnel decisions, including decisions on what employees travel to the US from Korea.

137.    Chairman Lee implements his direct control of Cosmax through his two children, BJ Lee and Byung-man Lee. BJ Lee is the President and CEO of Cosmax West, overseeing all US operations.

138.    Similarly, Cosmax East is run by Byung-man Lee, who oversees operations in China. Upon information and belief, Byung-man Lee is involved in Cosmax's operations in Indonesia, Thailand, and Australia.

139.    All of Cosmax's entities share an identity of interest. They have deep rooted economic codependence, widely share employees, and are under the common direction and control of Chairman Lee through his family. As such, all 32 entities should be treated as affiliates for purposes of the PPP certifications as well as PPP headcount requirements.

*Defendants Flouted Headcount by Disregarding Affiliation Rules and Undercounting Employees*

140.    Defendants made material misrepresentations in their PPP applications, without which they would have exceeded the relevant headcount caps by leaps and bounds. Even stopping short of looking at all 32 entities as affiliates, Cosmax USA and NuWorld exceeded the cap by ***thousands*** of employees under the ownership-control tree of Cosmax, Inc. This is the case when merely accounting for a single affiliate, Cosmax China.

141.    Similarly—albeit by a less ridiculous margin—Cosmax NBT USA also exceeded its cap when looking to its Cosmax NBT ownership-control affiliates. Looking at the larger picture—as one should—with all 32 entities connected through ownership-control and/or identity of interest, Defendants egregiously underrepresented employee headcount.

142.    To qualify for PPP funds, a business must have no more than 500 employees or qualify for an industry specific cap. 15 U.S.C. § 636(a)(36)(D)(i). These industry specific limits are the North American Industry Classification System ("NAICS") codes. 13 C.F.R. § 121.201.

143.     Defendants Cosmax USA and NuWorld self-selected NAICS codes with an employee limit of 1,250, while Cosmax NBT USA is believed to have self-selected a NAICS code with an employee limit of 1,000. [14]

144.     The second draw placed stricter limitations on the number of employees. 15 U.S.C. § 636(a)(37). The second draw was limited to businesses with no more than 300 employees, without regard to differing NAICS code caps. 15 U.S.C. § 636(a)(37)(A)(iv)(I).

145.     Employees, for purposes of determining a headcount, include "individuals employed on a full-time, part-time, or other basis." 15 U.S.C. § 636(a)(36)(D)(v); 13 C.F.R. § 121.106. "This includes employees obtained from a temporary employee agency." 13 C.F.R. § 121.106.

146.     A borrower must calculate the total number of employees for purposes of eligibility. *See* 15 U.S.C. § 636(a)(36)(D)(i).

147.     In the first draw, the three US entities reported the following headcount figures: (1) Cosmax NBT USA: 121, (2) NuWorld: 271, and (3) Cosmax USA: 215.

148.     However, Defendants failed to include temporary workers in these counts, despite improperly using these workers to inflate wages for purposes of calculating the loan amount available to them.

149.     The number of temporary workers was by no means insignificant. NuWorld, at the height of its reliance on temporary workers, utilized as many as 600 to 700 temporary workers at

---

[14] Across Cosmax USA and NuWorld's various loans, Defendants utilized code 325620, for Toilet Preparation Manufacturing (*i.e.*, toiletry manufacturing) or 325412, for Pharmaceutical Preparation Manufacturing. Cosmax NBT USA used code 325411, for Medicinal and Botanical Manufacturing. Relator does not opine on the propriety of this NAICS code's applicability to Defendants, as—assuming *arguendo* this larger employee cap is proper—Defendants nonetheless exceeded this cap.

any given time. While that number has significantly decreased, NuWorld still utilizes hundreds of temporary workers.

150.    Relator has personal knowledge of temporary workers being used at Cosmax USA and, upon information and belief, similar practices were used at Cosmax NBT USA.

151.    NuWorld used approximately 312 temporary workers, while Cosmax USA used approximately 251 temporary workers. This represents approximately 563 workers that were not disclosed by Defendants. Relator is unaware of how many temporary workers are utilized by Cosmax NBT USA; however, based on the numbers utilized at the other two domestic entities, it is believed that there are potentially hundreds of additional unreported temporary workers.

152.    In an email with a senior HR employee at Cosmax, Inc., Relator inquired into the employees of other entities. Relator stated that he is aware of around 3,000 Cosmax China employees.

153.    Relator then asked if this meant that total Cosmax employees were approximately 5,000, when including Cosmax, Inc. and the US entities. He was informed that there were additionally 208 employees at PT Cosmax Indonesia, 160 at Cosmax Thailand Co., Ltd., and 107 at Cosmax NBT Australia Pty. Ltd. This is an additional 3,475 employees that were not disclosed in PPP applications.

154.    Relator has also obtained employee counts for the three Korean parent entities by reviewing company profiles. Those reports show the following: (1) Cosmax, Inc.: 1,153, (2) Cosmax BTI, Inc.: 208, and (3) Cosmax NBT, Inc.: 566. This is an additional 1,927 employees.

155.    When added to temporary employees and those disclosed in internal emails, Relator is conservatively aware of approximately *5,965* undisclosed employees. When added to US

employee counts for all three entities, the total known employee count across all affiliates is approximately 6,572, a staggering ***5,322 employees over the larger NAICS cap***.

156.    While Relator is not aware of the specific employee count at the precise moment of each PPP application submission, upon information and belief, any fluctuation over time did little to mitigate the regulatory impact. With such a massive overage of undisclosed employees, Defendants undeniably had thousands of unaccounted-for employees at the time of their respective applications.

157.    Defendants have also made different headcount representations to other government agencies that further call into question the validity of the headcount submissions in their PPP applications.

158.    As discussed in a subsequent section, Defendants, through Relator, routinely submitted invitation letters to US Customs and Border Patrol as part of the B1 visa program. In some letters, Defendants stated, "Our business . . . employs approximately 800 U.S. based workers." Even relying on Defendants' artificially deflated headcounts, they exceed their cap.

159.    In reality, this already staggering number of known employees falls well short of the likely total. Cosmax is made up of at least 32 distinct entities. Even adding temporary workers, the entities discussed in internal emails, and the three Korean parent companies to the totals of the three PPP recipients, there are another 22 entities with unknown numbers of employees.

160.    Admittedly, Cosmax West and East, as holding companies, are likely to have only a nominal number of employees. However, that leaves at least 20 entities with meaningful employee counts. With this in mind, Defendants, upon information and belief, underrepresented their headcount by tens-of-thousands of employees.

161.    Looking purely to ownership-control, the most clear-cut test, Cosmax USA and NuWorld have a total of approximately 5,570 employees across Cosmax, Inc. based affiliates.[15] Again, that does not include the fifteen other subsidiaries under the ownership control of Cosmax, Inc.

162.    Similarly, Cosmax NBT USA also, upon information and belief, exceeded the cap based on the ownership-control test alone. Of the seven NBT entities, three have known employee counts totaling 794.[16] This is just 206 employees shy of its 1,000 employee cap under their selected NAICS code, a gap easily closed by the remaining four entities with unknown employee totals and Cosmax NBT USA's unknown number of temporary employees.

163.    Defendants' fraud is even more severe under the stricter headcount rules for the second PPP draw. There, the cap was firmly set at 300 employees, without regard to differing NAICS code caps. 15 U.S.C. § 636(a)(37)(A)(iv)(I). Cosmax USA reported 232 employees.

164.    At that time, merely adding NuWorld as an affiliate would have exceeded the limit, without including temporary workers for those entities.

165.    NuWorld's Form 941 filings from the time period of the second Cosmax USA loan—the second quarter of 2021—show an additional 202 employees.

166.    Defendants were well aware of this employee count across entities and well aware of PPP's affiliation and headcount requirements. Despite this, Defendants massively underrepresented their employee numbers to fraudulently obtain millions in forgivable loans.

---

[15] (1) NuWorld: 583; (2) Cosmax USA: 466; (3) Cosmax, Inc.: 1,153; (4) Cosmax China: 3,000; (5) PT Cosmax Indonesia: 208; and (6) Cosmax Thailand Co., Ltd.: 160.
[16] (1) Cosmax NBT USA: 121, (2) Cosmax NBT, Inc.: 566, and (3) Cosmax NBT Australia Pty. Ltd.: 107.

## Figure 3

| Entity | Known Employees |
|---|---|
| **Cosmax BTI** | |
| Cosmax BTI | 208 |
| **Cosmax BTI Total** | **208** |
| **Cosmax, Inc. Entities** | |
| Cosmax, Inc. | 1,153 |
| Cosmax USA | 466 |
| NuWorld | 583 |
| Cosmax China | 3,000 |
| PT Cosmax Indonesia | 208 |
| Cosmax Thailand Co., Ltd. | 160 |
| **Cosmax, Inc. Total** | **5,570** |
| **Cosmax NBT Entities** | |
| Cosmax NBT | 566 |
| Cosmax NBT USA | 121 |
| Cosmax NBT Australia Pty. Ltd | 107 |
| **Cosmax NBT Total** | **794** |
| **Total Across Parents** | **6,572** |

*Defendants Routinely Pushed for Higher PPP Funding and Forgiveness*

167.    From application through forgiveness, Relator faced constant and extreme pressure from Defendants, primarily through BJ Lee, YB Kim, Cosmax USA's CFO, and Sang Jin Byun (hereinafter "Byun"), Cosmax USA's Finance Director, to obtain maximum loan amounts and have those loans forgiven.

168.    On September 30, 2020, Relator received an email from Byun, with the COO, Jeongdae Ha (hereinafter "Ha"), copied stating, "PPP loan[s] must be forgiven for the (sic) both entities. When can it be confirmed and known to be forgiven? YB [Kim, CFO] wants to book it in Q4 2020." Relator responded:

> Not sure what you mean by "must be forgiven". There is no guarantee in this. So far, no company in USA has had their loan forgiven and timing is still very fluid as the government and the bank try to work it all out. The process still has a lot of uncertainty and it is not known how slow it will move.

39

> Due to the amount of our loans, my expectation is that we will get a lot of scrutiny from our banks and SBA… which translates into more time.
>
> This is a large project with many nuances… it will take time to get through it. My biggest concern is not timing, but to get the loan forgiven to the largest extent possible.

169.    Relator forwarded this response to BJ Lee.

170.    Throughout these communications management pressured Relator to apply for significant PPP loans without regard to Relator's comments on the actual regulatory landscape.

171.    Over the course of these discussions, it became clear that others in management were suspicious of the propriety of these loans and sought to distance themselves.

172.    In one email, Byun reached out to Relator after an email blast from PNC regarding second draw loans. Byun inquired whether Relator had updated "top management" on the second draw. Relator responded by requesting information for the application. Then, Byun told Relator, "please get YB as signer, not me if required. He is CFO."

173.    It is also clear from these emails that PPP initiatives were being directed from Defendants' Korean parent companies. In one example, Relator received an email from Sungsoo Kim, Cosmax USA's Financial Planning and Analysis director, asking for NuWorld's PPP loan application and related documents stating, "This is requested by HQ." HQ was universally understood to mean Chairman Lee and the South Korean parent.

174.    Not only did Relator face pressure to obtain the loans and subsequent forgiveness, but management also directed that the loan amounts be inflated.

175.    Both Cosmax USA and NuWorld impermissibly included wages paid to temporary workers in their calculations for the loan amount, despite the fact that these workers were not employees for purposes of loan amounts.

176.    Moreover, Defendant impermissibly excluded these workers from headcounts, while using their wages to boost the overall loan amount. The decision to include temporary workers in the loan amount calculation came from BJ Lee and others in management.

177.    On December 10, 2020, Relator received an email from Cosmax USA's PPP contact at PNC, Julie Hill. Hill stated, "[t]he outstanding loan amount appears to be higher than what the payroll documents support." Hill followed up with Relator the next month noting that the issue was related to wages for temporary workers that were not listed as employees on Cosmax USA's taxes, and that "it was concluded that they were employed by an independent agency that may have also applied for PPP relief for the same employees."

178.    As a result, a portion of the first Cosmax USA loan was not forgiven. Despite this, of the full $4,771,600.00 obtained under the first Cosmax USA loan, the Government forgave $3,097,196.00 in principal and $45,855.71 in interest, on October 27, 2021.

179.    Despite similar impropriety in NuWorld's application, the full amount of that loan was forgiven. On September 9, 2021, the Government forgave $5,249,510.00 in principal and $70,722.57 in interest on the NuWorld loan.

180.    While Relator was only involved in the loans for NuWorld and Cosmax USA, upon information and belief, similar misrepresentations were made in Cosmax NBT USA's loan application. Upon further information and belief, Cosmax NBT USA's loan was fully forgiven.

181.    On June 13, 2022, the Government forgave $2,000,000.00 in principal and $24,444.44 in interest on the second Cosmax USA loan.

182.    Relator repeatedly informed management of this misrepresentation, in regards to both Cosmax USA and NuWorld; however, those concerns fell on deaf ears, and Defendants took no action to remedy the known overpayment to NuWorld.

183. On August 9, 2021, Relator described the issue in an email to BJ Lee, YB Kim, and Sungsoo Kim, saying that the portion of the loan attributable to temporary labor was ineligible and must be either repaid or converted to an unforgiven loan. Sungsoo Kim responded "[j]ust to make sure, regarding PPP loan being ineligible, is it Nu[W]orld's or Cosmax[]USA's?"

184. This demonstrated Defendants' understanding that NuWorld's application contained the same inaccuracies as Cosmax USA. Relator clarified this connection saying, "[t]his is the loan in for Cosmax USA entity. Forgiveness on the loan for NuWorld entity is so far proceeding at the full amount."

185. Despite this, no action was taken. The only response was Sungsoo Kim saying, "[t]hank you for providing detail."

186. From the outset, Defendants pressured Relator to apply for and seek forgiveness of PPP loans. This even included directives to inflate payroll to garner larger loans. Even after some of these issues were spotted and again raised internally by Relator, no action was taken.

187. Defendants fraudulently obtained $13,439,910.00 in PPP loans by concealing the affiliation of 32 entities. The vast majority of these loan amounts were forgiven in full.

188. Defendants underrepresented their headcount by thousands, if not tens of thousands of employees. All entities were under the ownership control of the three Korean parent companies at the time Defendants applied for PPP loans.

189. Moreover, all 32 entities shared an identity of interest making them a unified network of affiliates. At all times, these fraudulent loan applications and subsequent forgiveness applications were orchestrated and directed by Cosmax's senior leadership.

### *Illegal Activity Ineligibility – Defendants' Fraudulent Immigration Schemes*

190.    Businesses engaged in illegal activity, whether at the local, state, or federal level, were prohibited from applying for or receiving PPP loans. 13 C.F.R. § 120.110(h). Importantly, the regulation did not specify that the illegal activity be criminal; rather, it broadly prohibited businesses from applying for PPP loans if they engaged in *any* illegal activity. *Id.*

191.    For instance, if a company was using deceptive employment practices to abuse the US immigration system and hire undocumented workers, in direct violation of US immigration laws, such practices would prohibit those companies from applying for PPP loans.

192.    That is exactly what happened in this case.

193.    Not only did Cosmax USA and NuWorld intentionally mislead the Government as to their headcounts and manipulate affiliation requirements to obtain loans (which have been forgiven almost in their entirety) the entities—in particular, NuWorld and Cosmax USA—also applied for loans while engaging in several immigration fraud schemes. These schemes afforded Cosmax USA and NuWorld an illicit avenue to skirt tax regulations and avoid paying competitive wages to retain talent.

194.    Within the last approximately two years, Relator became aware of or had direct insight into the various immigration fraud schemes at NuWorld and Cosmax USA, including:

a.    Misusing the B1 visa program.

b.    Knowingly employing temporary workers that were unauthorized to work in the US.

c.    Knowingly employing spouses of Cosmax USA employees when the spouse was not authorized to work in the United States.

43

195.    Because Cosmax's conduct violated several laws, it was ineligible to apply for PPP loans.

196.    This did not stop Cosmax. Rather, Cosmax, and its subsidiaries applied for and received loans—the majority of which have been forgiven.

### Cosmax Entities Abused the B1 Visa and Visa Waiver Program Systems by Falsely Claiming Korean Employees Were Entering the United States for Valid Purposes When They Were in Fact Coming to Perform Skilled and Unskilled Labor for Domestic Cosmax Entities

197.    B1 visas allow foreign nationals to temporarily enter the US for limited business purposes, such as to attend a conference. B1 visa holders are prohibited from performing skilled or unskilled labor while in the US. 8 U.S.C. § 1101(a)(15)(B). B1 visas are available throughout the year, whereas other visa applications are only available during certain periods and are capped on a yearly basis.

198.    Korean citizens are exempt from visa requirements under the Visa Waiver Program. The Visa Waiver Program permits Korean citizens to travel to the US for tourism or business for a maximum of 90 days without obtaining a business or tourism visa.

199.    To qualify for this program the purpose of the visit must be permitted on a B visitor visa—examples include traveling to the US to attend a conference, participate in meetings, or provide/receive training. Therefore, the same restrictions that accompany a B visitor visa, namely, the prohibition on performing any skilled or unskilled work while in the US, also apply to the Visa Waiver Program.

200.    For several years, Cosmax entities have drafted, executed, and provided hundreds of misleading and fraudulent invitation letters to US Customs and Border Patrol to aid Korean workers in entering the US under false pretenses.

201.    Invitation letters help establish these requirements by certifying that the employee is coming to the US to offer training in a specific area or that the employee is an expert in a particular field and their skills are temporarily needed in the US.

202.    Cosmax's representations in the invitation letters to US Customs and Border Patrol are almost always false.

203.    In truth, employees from the Korean affiliated entities routinely came and continue to come to the US to provide support to US-based Cosmax companies and perform meaningful work in specific roles.

204.    A review of the invitation letters shows that minimal changes were made from person to person and that the individuals brought to the US were typically characterized in some form or fashion as a "master" or "expert" in a particular area. Again, in truth, most of these individuals were not masters but were typical workers brought to the US to help defray the costs of hiring US-based workers.

205.    This process was known to, and in some instances direct by, executives at Cosmax—both in the US and in Korea. At the beginning of this process, individuals in Korea helped the employee fill out the necessary paperwork to enter the US (aside from the entry letters).

206.    As established in previous sections, nothing goes on at any of the Cosmax entities without Chairman Lee's knowledge and approval, and certainly not at a Korean-based entity where he is located.

207.    Furthermore, US based executives were well aware of this process as they were the ones ordering Relator to draft the entry letters.

208.    In several emails, Cosmax executives asked Relator to draft an invitation letter for a specific individual who would "replace" a current US employee or foreign-employee that was

providing skilled labor while in the US on a B-1 visa. This was common practice and Relator was consistently asked to provide such letters.

209. Indeed, from 2016 to the present, it is estimated that Relator and others drafted hundreds of these letters.

210. The email correspondences surrounding these travel letters makes it clear that the individuals coming from South Korea were not entering the US for appropriate business reasons. Rather, they were entering to supplement Cosmax's workforce and, in some instances, replace individuals who were working in the US and needed to return to South Korea to comply with the 3-month limitation.

211. For instance, on November 5, 2021, Harry Son, an IT Manager, at the direction of others, sent Relator an email asking, "[c]ould you give the travel letter for Yeonghwan Jeon? **He will be working Solon for temporary replace William**."

212. Mr. Jeon's entry letter stated that he was "a cosmetics production expert" and that his presence was needed in the US to "provide onsite technical training and support for [Cosmax's] manufacturing operation team on matters concerning manufacturing processes and the use of specialized personal hygiene and cosmetic equipment, which was purchased and imported for [Cosmax's] US business." There was no mention of his predecessor "William" or that Mr. Jeon's true purpose in coming to the US was to replace William.

213. Indeed, to the extent William was also a "cosmetics production expert" one would assume that he provided the US based employees with the necessary skills and training to operate the specialized machines, making Mr. Jeon's presence in the US unnecessary.

214.    Obviously, Cosmax executives could not allow Relator to provide the true rationale for Mr. Jeon's trip to the US so they instructed and even pressured him to formulate a reason for the trip that would allow Mr. Jeon to enter the country and work for several months in the US.

215.    The email is clear—Mr. Jeon would not be coming to the US to provide any training on a specific skill set. Rather, Mr. Jeon was needed to replace another individual working at Cosmax USA, which is a violation of the visa waiver program as well as B-1 visa rules.

216.    In another email, sent on August 16, 2021, Ha, Cosmax USA's COO, asked Relator to send a letter to him for a powder compounder. Ha wrote, "I need letter. KIM/TAEEON is powder compounder and Mr. Lee go back [to] Korea[.] **So TAEEON will replace MR Lee [r]ole[.]**"

217.    Mr. Kim's entry letter stated that "Mr. Kim is a master cosmetics compounder...[who] will provide onsite technical training and support for [Cosmax's] U.S. production operation team...[h]is specific knowledge cannot be shared effectively without an onsite visit."

218.    The letter did not mention that Mr. Kim's real purpose in coming to the US was to replace another worker. But it is clear from the emails that Mr. Kim's true purpose in coming to the US was not to provide training or share his expertise; rather, it was to fill a vacancy created by Mr. Lee's return to South Korea.

219.    In yet another example, on June 29, 2021, Ha again asked Relator for a letter. Ha wrote, "Need letter[.] Mr. Won Role is planning[.] **He will work for Solon after get the visa [s]o need letter first.**" Mr. Won's entry letter stated that he is "a cosmetic manufacturing expert...[who] will provide onsite technical training and support for [Cosmax's] U.S. supply chain

team on matters and transactions between [Cosmax's] parent company, South Korean vendors, and US vendors to help the US team build its processes."

220.    The letter went on to state that Mr. Won "will not become an employee of Cosmax USA." Again, there was no mention that Mr. Won would actually work when he was in the US; rather, he was framed as an "expert" whose specific skill set was needed for Cosmax to operate efficiently and effectively. The email tells a different story.

221.    It is clear from Mr. Ha's email that, despite representations to the contrary in the entry letter, the intent was for Mr. Won to become a Cosmax USA employee.

222.    Cosmax continues this practice to this day. On July 5, Relator received a Microsoft Teams message from Binkyu Min, directing him to prepare an access card for JH Lee, an individual employed by the Korean parent company but who would work at Cosmax USA for 6 months as a "compounding planner."

223.    When Relator asked whether Lee would be "scheduling all of [Cosmax's] batches" Min replied, "[y]es, he will do it." Cosmax brought on Lee to perform labor in the US, in direct violation of B visa and Visa Exception program requirements and regulations.

224.    Individuals on B-1 visas are not permitted to engage in skilled or unskilled labor while in the US.

225.    Despite this prohibition, Cosmax USA brings individuals to the US to perform such labor, like compounding and mixing, that would otherwise be performed by US citizen or a visa holder.

226.    B-1 workers also are not required to pay US taxes due to their limited stay in the US. Because Cosmax was using B-1 workers to fill vacancies rather than hiring US citizens or

going through the H-1B process, it deprived the US government of tax revenue it otherwise would have received from US citizens or H-1B holders.

### *Cosmax Knowingly Employed Temporary Workers at its New Jersey Location Even Though Those Workers Were Not Authorized to Work in the United States*

227.     NuWorld, along with Cosmax West executives, has knowingly engaged in a pattern of using undocumented workers to avoid paying fair wages, avoid providing benefits for workers, and to cut corners on other regulations. These acts violate several regulations including, but not limited to: 8 U.S.C. § 1324a(a)(1)(B), which prohibits the unlawful employment of aliens; § 1324c(e) which makes it a crime to knowingly employ 10 or more unauthorized workers; and § 1324a(a)(2) which makes it unlawful to continue employing an undocumented individual after learning of such fact.

228.     The Cosmax entities used a third-party contracting service, Staffing Alternatives, to find workers to fill gaps in its labor force at NuWorld. Cosmax is aware that the unauthorized workers obtain and use fraudulent employment documents to gain employment with the staffing agency. This process, and the fact that the majority of temporary workers were undocumented, was an "open secret" with NuWorld management.

229.     Relator is aware that NuWorld is engaging in improper employment practices. Relator came to understand that Cosmax executives were aware of and indeed supported the company's use of unauthorized workers.

230.     NuWorld's use of undocumented workers predated the company's acquisition by Cosmax. Upon information and belief, the undocumented workers were a holdover from before the purchase and it was just easier for Cosmax to turn a blind eye to the staffing issues rather than address the illegal activity head on.

231.    A former NuWorld manager told Relator that 90% of the temporary workers do not have proper work authorization. It is an "open secret" that these individuals cannot legally work in the United States.

232.    During the conversation, which took place in the summer of 2021, Relator explicitly asked Rosenbaum, "you know they [the temporary workers] are illegal, right?" Rosenbaum responds, "yes, of course I know."

233.    Relator also brought his concerns to Cosmax's CEO, BJ Lee, as well as the COO, Ha. During a conversation with Ha, Relator stated that the reason that there was little to no attrition from the New Jersey facility was because the majority of the workers are "illegal" or "undocumented."

234.    In contrast, the Solon location was seeing a great deal of attrition in the immediate aftermath of the pandemic. This problem was remedied only when Solon increased its minimum wage to entice applicants—something NuWorld did not have to worry about because it had essentially locked in its workforce by using individuals who could not get work elsewhere because they were undocumented.

235.    Ha again confirmed that he was aware that NuWorld was using undocumented workers in another conversation:

> **Alex Novik:** "…you got to remember many of them are illegal and undocumented…they don't have papers…"
>
> **Mr. Ha:** "…ahhhhh." "I know…" [conversation continues].

236.    Relator then brought the issue to the CEO's attention, but to no avail.

237.    Despite Ha's clear prior knowledge that NuWorld was using undocumented workers and Relator's subsequent conversations with Ha and BJ Lee, NuWorld continued using the contracting service and its workers, with the full knowledge that most of them were

50

undocumented and not authorized to work in the US—all of which violated US immigration laws and regulations.

238.    These violations of the immigration laws occurred during the pandemic, contemporaneous to the certifications made in the PPP applications and the forgiveness granted for all four Cosmax PPP loans. NuWorld continues to use Staffing Alternatives to this day.

### Cosmax Employed Spouses of Cosmax Employees That Did Not Have Work Authorization and Hid Payments to Those Employees by Increasing Payroll to the Authorized Spouse

239.    In yet another illegal immigration scheme that occurred during the time Cosmax certified to no illegal activity and submitted its applications, Cosmax concealed the fact that it employed unauthorized workers by paying the wages earned by unauthorized workers to their authorized spouses.

240.    Relator is aware of at least two incidents in which Cosmax improperly paid an unauthorized worker by funneling the payment through that worker's spouse.

241.    Cosmax would increase the spouse's payroll to compensate the undocumented worker for that worker's labor. Then, once the unauthorized spouse received work authorization, the payroll would be adjusted to include the now authorized worker and to adjust the spouse's wages accordingly.

242.    Through this scheme, Cosmax violated immigration laws, dodged tax liabilities, and was ineligible to participate in the PPP program.

### Manjot Gill and Manvir Kaur

243.    The first instance involved payments for Manjot Gill through his wife Manvir Kaur. Gill was a material handler at Cosmax and held work authorization.

244. In or around April 2021, his work authorization lapsed, and he was no longer legally permitted to work in the US. Cosmax executives were aware that Gill's work authorization had lapsed but kept him working.

245. To compensate Gill for his unauthorized work, Cosmax executives directed Relator to increase Kaur's pay to cover both her and Gill's hourly wages.

246. From April 26–May 9, 2021, Kaur's pay rate was $16.50/hr, not including overtime for which she was compensated at a higher rate of $24.75/hr. Then, Kaur's pay rate was increased for the pay period from May 24–June 6, 2021, to $33.00/hr for her typical 40-hour rate and to $49.50/hr for overtime.

247. These rates were increased yet again for the pay period from June 21–July 4, to $34/hr and $51/hr for overtime.

248. Kaur continued to be paid at $34/hr until October 1, 2021, when her pay was reduced to $17.25/hr. This reduction in hourly rate coincided with Gill receiving his work authorization, which he received in or around October.

249. Now able to work in the US, Gill was also able to receive direct payments for his work from Cosmax without drawing suspicion or questions from US immigration authorities or others within the company.

250. This conduct occurred while Cosmax USA was waiting for forgiveness on its first PPP loan. Cosmax obtained forgiveness for the majority of the loan on October 27, 2021, in contravention of the rules and regulations surrounding the loan process.

<u>SeokJoo Lee and Somi Jeon</u>

251. While Cosmax was waiting for forgiveness on its second loan, Cosmax repeated this pattern with yet another couple—SeokJoo "Ian" Lee and Somi Jeon.

252.    Ian was a Cosmax Korea employee who routinely visited the US. Ian has traveled between Korea and the US throughout his employment with Cosmax.

253.    In January 2018, Esther Park, a Senior Manager and Project Planning Manager at Cosmax USA, emailed Relator asking him to prepare a travel letter for two more people, one of whom was Seokjoo Lee. The email stated that Ian would arrive to the US working as a QC manager and would return in February.

254.    Ian is now currently residing in the US, without work authorization, and working at Cosmax USA.

255.    Relator asked Ha about Ian's status. Ha acknowledged that Ian was unauthorized to work in the US; but Ha still requested for Relator to pay Ian through Ian's wife, Somi.

256.    In November 2021, Somi's salary was increased from $101,878 to $163,878—a $62,000 increase.

257.    This arrangement ceased when Somi went on maternity leave in July 2022. However, Relator was recently asked to re-instate this payment process as Somi is returning to work at the end of October.

258.    On September 28, 2022, Relator received an email from Steven Hong, Director of Human Resources, stating that because Cosmax stopped paying Somi while she was on maternity leave, it "also stopped paying Ian Lee."

259.    Mr. Hong then went on to ask how much Cosmax owed Ian because of the gap in payments. In a subsequent email, Mr. Hong requested Relator to make a "retro payment (lump sum) for Ian when Somi comes back" for a total of "$18,033.31." As of the date of that email, Ian had not received work authorization.

260.    Cosmax USA obtained forgiveness for its second loan on June 13, 2022, despite knowingly engaged in this illicit activity.

### *Illegal Activity Ineligibility – Defendants' Fraudulent Tax Evasion Schemes*

261.    As provided above, businesses engaged in any activity that is illegal under local, state, or federal law were prohibited from applying for or receiving PPP loans. 13 C.F.R. § 120.110(h).

262.    Defendants failed to pay—and, in fact, deliberately attempted to evade paying—federal payroll withholding taxes for Korean nationals working for the company in the United States, federal income withholding taxes on taxable fringe benefits paid to Korean nationals working for the company in the United States, and Ohio sales and use tax on employment services supplied by employment staffing companies.

263.    Defendants have deliberately engaged in a pattern of tax evasion schemes to avoid paying lawfully owed taxes in violation of United States and Ohio (and potentially other) laws. Relator is aware that Defendants did so while actively applying for and ultimately receiving PPP loans and forgiveness.

### *Between 2016 and 2021, Defendants Failed to Pay the Appropriate Ohio Sales and Use Tax on Employment Services Provided by Staffing Agencies*

264.    Ohio applies a sales and use tax to the retail sale, lease, and rental of tangible personal property as well as the sale of selected services in Ohio. OHIO REV. CODE ANN. § 5739.02. Between January 1, 1993, and October 1, 2021, Ohio imposed a sales and use tax on the provision of "employment services." OHIO REV. CODE ANN. § 5739.01(JJ).

265.    The Ohio Supreme Court held that in order for a service to be taxable pursuant to the definition of "'employment services" outlined in Ohio Rev. Code § 5739.01(JJ), that service must meet three requirements: "(1) it must provide or supply personnel on a temporary or long-

term basis, (2) the personnel must perform work or labor under the supervision or control of another, and (3) the personnel must receive their wages, salary, or other compensation from the provider of the service.'" *Bay Mech. & Elec. Corp. v. Testa*, 133 Ohio St.3d 423, 2012-Ohio-4312, 978 N.E.2d 882, at ¶ 17 (Per Curiam) (quoting *Moore Personnel Serv., Inc. v. Zaino*, 98 Ohio St.3d 337, 2003-Ohio-1089, 784 N.E.2d 1178, at ¶ 14 (Per Curiam)).

266. Under the exception outlined in Ohio Rev. Code § 5739.01(JJ)(3), "employment services" does not include "[s]upplying personnel to a purchaser pursuant to a contract of at least one year between the service provider and the purchaser that specifies that each employee covered under the contract is assigned to the purchaser on a permanent basis." OHIO REV. CODE ANN. § 5739.01(JJ)(3).

267. In the context of Ohio Rev. Code § 5739.01(JJ)(3), permanent basis "means that an employee is 'assigned[ed] to a position for an indefinite period,' which in turn means that (1) the assignment has no specified ending date and (2) the employee is not being provided either as a substitute for a current employee who is on leave or to meet seasonal or short-term workload conditions." *Bay Mech. & Elec. Corp.* at ¶ 18 (quoting *H.R. Options, Inc. v. Zaino*, 100 Ohio St.3d 373, 2004-Ohio-1, 800 N.E.2d 740, at ¶ 21).

268. This exemption is treated as an exception from taxation and, as a result, must be strictly construed against the taxpayer's claim for tax relief. *Id.*

269. Since at least 2016, Cosmax USA routinely used temporary personnel supplied to it by three primary staffing agencies: (1) Legacy Staffing ("Legacy"); (2) Thel America ("Thel") —also known as Thel Solutions; and (3) Schneider Blake ("SB").

270. During that time, Cosmax USA paid approximately $8 million a year for temporary labor supplied by multiple staffing agencies. Rather than paying the temporary workers directly, Cosmax USA paid the staffing agencies through a number of invoices issued by the staffing

agencies to Cosmax USA. These invoices often did not include sales and use tax on the provision of employment services.

271.    Cosmax USA operated its factory pursuant to an assembly line framework utilizing unskilled labor. On any given day, to meet changing production needs, Cosmax would hire up to 250 temporary assembly line workers to work for only that single day.

272.    This unskilled labor was ordered daily by Cosmax USA and decisions regarding how many workers to hire frequently fluctuated from day-to-day based on custom orders. Decisions regarding the number of workers necessary for the following day were often made last minute.

273.    These unskilled laborers worked under the supervision of a small number of permanent employees including mechanics, line leaders, and supervisors. These temporary personnel received their wages, salaries, and other compensation through their respective staffing agencies—not Cosmax USA.

274.    Cosmax USA received workers assigned to it by staffing agencies on a temporary basis, those workers worked under the supervision and control of permanent Cosmax USA employees, and those workers received their wages, salary, and compensation directly from the staffing agencies.

275.    These temporary workers were not assigned to a position at Cosmax USA for an indefinite period. Instead, they were scheduled and rescheduled daily as needed.

276.    These workers were assigned based upon short-term workload conditions related to individual custom orders. Based upon the foregoing, Cosmax USA was required to pay sales and use tax on these employment services. *See* OHIO REV. CODE ANN. § 5739.01(JJ).

277.    Relator notes that eventually Cosmax USA restructured its staffing contract with one agency—SB—to provide for a consistent workforce of fifty workers and thereby avoid sales and use tax. Nevertheless, Cosmax USA never paid sales and use tax for the fluctuating, temporary workers assigned to it by its other staffing agencies—Legacy and Thel.

278.    Relator submits that Cosmax USA appears to have relied on Legacy and Thel to a greater degree than SB precisely because those entities allowed it to avoid paying sales and use tax.

### Defendants Failed to Withhold Income Taxes on Taxable Fringe Benefits

279.    All employers are required by federal law to withhold federal income tax from their employees' wages. 26 U.S.C. § 3402. The term wages means "all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration (including benefits) paid in any medium other than cash[.]" 26 U.S.C. § 3401.

280.    Any fringe benefit provided by an employer is taxable and must be included in the employee's income unless the law specifically excludes it. 26 C.F.R. § 1.61-21. If an employee is given a temporary work assignment away from his or her regular place of work, certain travel expenses may be excludable. 2022 IRS Publication 15-A.

281.    Generally, a temporary work assignment in a single location is one that is realistically expected to last (and does in fact last) one year or less. *Id.* However, if the employee's new work assignment is indefinite, any living expenses reimbursed or paid by the employer must be included in the employee's wages as compensation. *Id.*

282.    Since at least 2019, Cosmax USA has provided significant fringe benefits to employees that were not properly recorded as wages for tax purposes. These fringe benefits

included the payment of automobile leases, automobile insurance coverage, apartment rentals, use of a single-family home, personal property insurance coverage, living allowances, per diems, and cell phone assistance payments.

283.    At any given time Cosmax USA provided approximately 20 to 30 vehicles to Korean nationals employed by Cosmax USA for their personal use.

284.    Cosmax USA provided approximately 20 to 30 apartments for the use of Korean nationals employed by Cosmax USA in the United States.

285.    These fringe benefits were not properly included in payroll for these employees and federal taxes including income tax were not withheld. These fringe benefits were not properly excludable as travel relocation expenses for temporary work.

286.    This failure was no mere oversight on the part of Cosmax USA. Rather, Cosmax USA failed to report these fringe benefits—or withhold the appropriate taxes—in a deliberate attempt to avoid paying US taxes.

### *Defendants Failed to Withhold Payroll Taxes from Korean Nationals Working in the United States*

287.    An employer must generally withhold 6.2% of their employees' wages in social security taxes and 1.45% of their employees' wages in Medicare taxes. 26 U.S.C. § 3101. In addition, an employer must also generally pay 6.2% of their employees' wages in social security taxes and 1.45% of their employees' wages in Medicare taxes. 26 U.S.C. § 3111.

288.    Under some circumstances, if an employer sends an employee from one country to work for that employer or an affiliate in another country for a period of five years or less, the employee continues to be covered by the home country and is exempt from coverage in the other country. Social Security Administration Publication No. 05-10197.

289. The United States and the Republic of Korea have a totalization agreement describing such an arrangement exempting international employees who remained employed by the company in the original country and who satisfy certain criteria. Social Security Administration Publication No. 05-10197. The exemption portion of this agreement applies only to employees of a Korean employer who are sent to work in the U.S. for five years or less. *Id.*

290. In order to be exempt, the employment cannot be expected to exceed five years. U.S.-Korean Social Security Agreement – Article 4.

291. Workers who are exempt from paying US social security taxes under such a totalization agreement must document their exemption by obtaining a certificate of coverage from the country that is covering them. Social Security Administration Publication No. 05-10197. The IRS states that "[c]ertificates of coverage issued by Korea should be retained by the employer in the United States." *Id.*

292. Cosmax USA and its affiliates routinely brought Korean nationals to work in the United States for Cosmax USA or its affiliates. Relator is aware of numerous individuals working in the United States indefinitely for whom Cosmax USA does not withhold U.S. payroll taxes.

293. Relator is aware that some of these employees have already worked in the United States for more than five years. Furthermore, Relator has spoken to other employees who state that their employment in the United States is expected to exceed five years.

294. Relator has also spoken with an employee of Cosmax USA who stated that he did not pay the Korean equivalent of the social security tax.

295. Relator previously asked Cosmax USA for ledgers to confirm withholdings in Korea for these employees but Cosmax USA failed to provide those ledgers to him.

296.    Defendants has deliberately failed to withhold payroll taxes from Korean nationals working in the United States in order to evade taxes.

297.    Defendants recently sought and received a refund for three years of previously paid payroll taxes which were paid for employees expected to remain in the United States indefinitely.

## CONCLUSION

298.    Defendants fraudulently obtained $13,439,910.00 in PPP loans by concealing the affiliation of 32 entities. Defendants underrepresented their headcount by thousands, if not tens of thousands of employees.

299.    Defendants were also ineligible to receive these government backed loans as they were engaged in an array of illegal activity. These illegal schemes include various forms of immigration fraud related to their US operations, such as misusing the B1 visa program, employing unauthorized temporary workers, and paying authorized spouses for the work of unauthorized spouses.

300.    The illegal schemes also include various tax schemes, such as evading federal payroll withholding taxes for Korean nationals working in the US, evading federal income withholding taxes on taxable fringe benefits, and evading Ohio sales and use tax on employment services supplied by employment staffing companies.

301.    Defendants have schemed the system, bilking the government out of millions intended to support small domestic businesses crippled by economic downturn.

## COUNT I
### Violation of Federal False Claims Act (Presenting and Causing False Claims)
### (31 U.S.C. § 3729(a)(1)(A))
(All Defendants)

302.    Relator incorporates all prior and subsequent paragraphs herein by reference.

303.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

304.     Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, by applying for and receiving PPP loans, and by applying for and receiving forgiveness on those loans, when Defendants were ineligible for those loans and for their forgiveness, as Defendants exceeded applicable employee caps and were engaged in illegal activity.

305.     Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

306.     The United States sustained damages because of the wrongful conduct of Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee.

## COUNT II
**Violation of Federal False Claims Act (False Statements Material to False Claims)**
**(31 U.S.C. § 3729(a)(1)(B))**
(All Defendants)

307.     Relator incorporates all prior and subsequent paragraphs herein by reference.

308.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

309.     Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee made, used, and caused to be made or used false records or statements—*i.e.*, the false certifications and representations

made and caused to be made by such Defendants when submitting the false PPP applications and the false certifications and representations made by such Defendants in submitting false forgiveness applications—to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

310. The false certifications and representations made by Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of such statements and actions.

311. The false certifications and representations made and caused to be made by Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee were material to the Government's payment of the false claims.

312. Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

313. The United States sustained damages because of the wrongful conduct of Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee.

## COUNT III
### Violation of Federal False Claims Act (Conceal Obligation to Pay)
### (31 U.S.C. § 3729(a)(1)(G))

(All Defendants)

314.    Relator incorporates all prior and subsequent paragraphs herein by reference.

315.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

316.    Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

317.    Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee did so with actual knowledge or with reckless disregard or deliberate ignorance.

318.    The United States sustained damages because of the wrongful conduct of Defendants Cosmax BTI, Cosmax, Inc., Cosmax NBT, Cosmax West, Cosmax USA, NuWorld, Cosmax NBT USA, Kyung-Soo Lee, and Byung Joo Lee.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of himself and the United States of America pray this Court as follows:

1.    Find that each Defendant violated the False Claims Act based on the causes of action alleged herein.

2.    Order that Defendants cease and desist from violating the False Claims Act.

3.    Enter judgment against each Defendant and award the United States treble damages based on the amount of damage suffered by the United States.

4.    Award the United States civil penalties between $5,000 and $10,000 for each violation of 31 U.S.C. § 3729, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890 (1990).

5.    Award Relator the maximum amount allowed under 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law.

6.    Award Relator reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law.

7.    Grant any other relief as required in the interest of justice.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury in this action on all issues so triable.

Respectfully submitted this the 2nd day of December 2022.

FLANNERY | GEORGALIS, LLC

Chris N. Georgalis (OH: 0079433)
1375 E. 9th Street, 30th Floor
Cleveland, OH 44114
chris@flannerygeorgalis.com
216-367-2095

Colin J. Callahan (PA: 328033)
(*Pro Hac Vice Application To Be Filed*)
707 Grant Street, Ste. 2750
Pittsburgh, PA, 15219
ccallahan@flannerygeorgalis.com
(412) 339-1336

Gavin A. Bell (NC: 54759)
(*Pro Hac Vice Application To Be Filed*)
227 W. Trade Street
Carillon Tower | Suite 950
Charlotte, NC 28281
gbell@flannerygeorgalis.com
(704) 949-2253

Nathan R. Coyne (OH: 100047)
(*Pro Hac Vice Application To Be Filed*)
175 S. Third Street, Ste 1060
Columbus, OH 43215
ncoyne@flannerygeorgalis.com
(380) 222-2421

*Counsel for Plaintiff-Relator*