**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**FILED**

MAY 0 5 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL],

        *Plaintiff,*

   v.

[Under Seal],

        *Defendants.*

CIVIL FILE NO.: 1:22-cv-2171

**AMENDED COMPLAINT**

**FILED IN CAMERA AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**<u>DO NOT SERVE</u>**

**DOCUMENT TO BE KEPT UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED

MAY 0 5 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **ALEXANDER NOVIK,** | CIVIL FILE NO.: 1:22-cv-2171 |
| *Plaintiff,* | |
| v. | |
| **COSMAX USA, CORP. d/b/a "Nu-WORLD" and "NU-WORLD, CORPORATION"** c/o Business Filings, Inc. 108 West 13th Street Wilmington, DE 19801 | **QUI TAM ACTION** **DO NOT SERVE** **JURY TRIAL DEMANDED** |
| & | |
| **NU-WORLD CORP.** c/o Corporation Service Company Princeton South Corporation Center 100 Charles Ewing Boulevard, Ste. 160 Ewing, NJ 08628 | |
| & | |
| **COSMAX NBT USA, INC.** 3350 Marquis Drive Garland, TX 75042 | |
| *Defendants.* | |

---

**FILED IN CAMERA AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

---

**AMENDED COMPLAINT PURSUANT TO 31 U.S.C. § 3729,** *et seq.* **OF THE FALSE CLAIMS ACT**

Upon present information and belief, none of the allegations set forth in this Amended

Complaint are based on public disclosure of allegations or transactions in a criminal, civil, or

administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing audit, or investigation, or from the news media. Relator is the original source of this information.

## AMENDED COMPLAINT

Pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* Plaintiff-Relator Alexander Novik (hereinafter "Novik" or "Relator") by and through counsel of record, brings this Amended Complaint, in camera and under seal, on behalf of the United States of America against Cosmax USA, Corp. d/b/a Nu-World and Nu-World Corporation ("Cosmax USA"); Nu-World Corp. ("NuWorld"); Cosmax NBT USA, Inc. ("Cosmax NBT USA"), and alleges as follows:

## INTRODUCTION

1.     Defendants, part of a conglomerate of Korean-based cosmetics and nutritional supplements manufacturers, fraudulently obtained $13,439,910.00 in PPP loans by concealing a vast network of affiliated entities. Based on Defendant's fraud, the Government forgave $11,765,506.00 in principal and $158,915.72 in interest, for a total actual loss to the Government of *$11,924,421.72,* trebled to a total damage amount of *$35,773,265.16*. Defendants intentionally underrepresented their headcount by thousands, if not tens of thousands of employees.

2.     In sum, Defendants have schemed the system, bilking the Government out of millions intended to support small domestic businesses crippled by economic downturn.

## PARTIES AND RELATED ENTITIES

3.     The real party in interest in this *qui tam* action is the United States of America.

4.     Relator Novik has been an employee of Defendant Cosmax USA since July 2014. He initially served as the company's controller. At one point, Novik was the highest-ranking US employee in finance at Cosmax USA, reporting to its then-CEO. In 2017, Novik was transferred

into Cosmax USA's human resources (hereinafter "HR") department in the position of HR director. Novik eventually became the HR director, overseeing that department for both Cosmax USA and Defendant NuWorld. While his title was in HR, Novik remained involved in an array of business and finance matters.

5.     Cosmax West is a corporation organized and existing under the laws of the state of Delaware. It was incorporated in 2017 as a holding company for Cosmax USA and, later, NuWorld. It has a registered agent for service, Corporation Service Company, located at 251 Little Falls Drive, Wilmington, DE 19808. Its principal place of business is 105 Challenger Road, 8th Floor, Ridgefield Park, NJ 07660. Based on Relator's understanding of the company, it has a President and CEO and no other employees and is merely a holding company.

6.     Cosmax USA is a corporation organized and existing under the laws of the state of Delaware. It has a registered agent for service, Business Filings Inc., located at 108 West 13th Street, Wilmington, DE 19801. Its principal place of business is 105 Challenger Road, Ridgefield Park, NJ 07660. Cosmax USA was founded in 2013 and operates in the cosmetics business line.

7.     NuWorld is a corporation organized and existing under the laws of the state of New Jersey. It was founded in 1991 and later acquired by Cosmax, Inc. It was subsequently transferred to one of Cosmax, Inc.'s holding companies, Cosmax West. It has a registered agent for service, Corporation Service Company, located at Princeton South Corporation Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, NJ 08628. Its principal place of business is 300 Milik Street, Carteret, NJ 07008. NuWorld operates in the cosmetics business line.

8.     Cosmax NBT USA is a corporation organized and existing under the laws of the state of Texas. Its principal place of business is 3350 Marquis Drive, Garland, TX 75042. Cosmax

4

NBT USA was formed in 2015 as a subsidiary of Cosmax NBT Cosmax NBT USA is in the nutritional supplements business line.

9.     As further detailed below, the entities that applied for PPP loans—Cosmax USA, NuWorld, and Cosmax NBT USA—were a part of the Cosmax Group. The Cosmax Group includes entities owned by Cosmax, Inc., Cosmax BTI, or Cosmax NBT.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Amended Complaint.

11.     Although the issue is no longer jurisdictional, the public disclosure provisions of the False Claims Act do not bar this suit. To the extent there has been a statutorily relevant public disclosure of the "allegations or transactions" in this Amended Complaint, the Relator is an "original source" of the information on which the Amended Complaint is based. Relator reported the information to the Government before any public disclosure of the allegations or transactions, has information that is independent of the public disclosure, and that information materially adds to any information the Government may have.

12.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide services of process and because Defendants have minimum contacts with the United States.

13.     Moreover, pursuant to 31 U.S.C. § 3732(a), "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by

5

section 3279 occurred." Defendants can be found in, reside, transact, and/or have transacted business in the Northern District of Ohio.

14.     Venue is proper in the Northern District of Ohio pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because one or more Defendants can be found and/or have transacted business in this district.

## COMPLIANCE WITH QUI TAM FILING REQUIREMENTS

15.     Pursuant to 31 U.S.C. § 3730(b)(2), this action is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders.

16.     The United States of America, acting by and through the Department of Justice, may elect to intervene and proceed with this action, within a period of sixty (60) days, after it has received both the Complaint and information, including a written disclosure of substantially all material evidence, relating to the instant action.

## COMPLIANCE WITH FED. R. CIV. P. 9(b)

17.     Certain documentary evidence necessary to prove the allegations in this Amended Complaint is in the exclusive possession of either the Defendants and/or the United States.

18.     With respect to each allegation herein made upon information and belief, Relator has, based on his personal knowledge, data, and experience, a reasoned factual basis to make these allegations, but he may lack complete details and/or documents that are within the possession of the Defendants and/or the United States.

19.     Relator is familiar with the policies and practices alleged herein as a result of his business dealings with Defendants and personal observations of the Defendants' schemes.

20.     Relator may not have access to all of the information regarding the schemes created and perpetuated by Defendants as some information is in the exclusive possession and control of the Defendants and/or the United States.

21.     As described herein, Defendants have caused to be submitted and, on information and belief, continue to cause submission of false and fraudulent claims to government programs for payment of items and/or services described herein.

## APPLICABLE LAW AND REGULATORY BACKGROUND

### *The Federal False Claims Act*

22.     The federal False Claims Act (the "FCA" or the "Act") originally was enacted in 1863, during the Civil War. Congress substantially amended the Act in 1986 and, again, in 2009 and 2010, to enhance the Government's ability to recover losses sustained as a result of fraud against it. The Act was amended after Congress characterized it as the primary tool for combating fraud, in need of modernization. Congress crafted the amendments to incentivize individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources towards prosecuting fraud on the Government's behalf.

23.     The FCA prohibits knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval and knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A)–(B). The Act further prohibits concealing or avoiding an obligation to pay the Government, including obligations to repay the Government. 31 U.S.C. § 3729(a)(1)(G). Conspiracy to commit any of the foregoing is also prohibited. 31 U.S.C. § 3729(a)(1)(C). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1). The civil penalties

are statutorily set between $5,000 and $10,000 for each violation, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890 (1990), and currently sit between $13,946 to $27,894.

24.     For purposes of the FCA, a person acts "knowingly" if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The FCA does not require proof that a defendant specifically intended to commit fraud. 31 U.S.C. § 3729(b)(1)(B).

25.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery. 31 U.S.C. §§ 3730(b)(1) and 3730(d). Such an action is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator. The FCA requires that the *qui tam* complaint be filed under seal for a minimum of sixty (60) days (without service on the defendant(s) during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. 31 U.S.C. § 3730(b)(2).

26.     The FCA also provides protections from retaliation for private entities and individuals, such as relators, who come forward with violations of the FCA. 31 U.S.C. § 3730(h).

### *Coronavirus Aid, Relief, and Economic Security Act and the Paycheck Protection Program*

27.     The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted on March 27, 2020, in response to the COVID-19 pandemic and its impact on the economy, individuals, and businesses. CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).

28.     One source of relief provided by the CARES Act was the Paycheck Protection Program ("PPP"), which gave financial assistance to small businesses for certain costs, such as payroll. *Id.* at 287; *see also* 15 U.S.C. § 636(a)(36)(F)(i). PPP provided $349 billion in fully

guaranteed SBA loans. The SBA launched the program on April 3, 2020. *See* Off. of Inspector Gen., Rep. 20-14, Flash Report Small Business Administration's Implementation of the Paycheck Protection Program Requirements (2020). By April 16, 2020, PPP lenders approved more than 1,661,000 loans totaling almost $342.3 billion. *Id.*

29.  Over the ensuing month, PPP was repeatedly extended and infused with additional funding. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, providing an additional $310 billion in funding. Pub. L. No.116-139, § 102, 134 Stat 620 (2020).

30.  On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act extended the program through March 31, 2021, and provided an additional $147.5 billion in funding. Pub. L. No. 116-260, § 323, 134 Stat. 1993, 2019 (2020).

31.  On March 11, 2021, the American Rescue Act of 2021 provided the PPP with another $7.2 billion. This brought the total PPP funding to $813.7 billion. Pub. L. No. 117-2, § 5001, 135 Stat. 4, 85 (2021).

32.  The loan's purpose was to provide a direct incentive for small businesses to keep their workers on payroll. Payroll costs included the sum of payments of salary, wage, or commission, paid leave, and payment for benefits and state and local tax. 15 U.S.C. § 636(a)(36)(A)(viii)(I). These funds could also be used for interest payments on mortgages, rent, and utilities. 15 U.S.C. § 636(a)(36)(F)(i)(IV)–(VI).

### *Eligibility for PPP Loans*

33.  An eligible business "employs not more than the greater of," 500 employees, or "if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern . . . operates." 15 U.S.C. § 636(a)(36)(D)(i). The borrowers were also required to make certain certifications, including certifying in good faith that the loan was

necessary to support the operations of the recipient due to the then-current economic conditions. 15 U.S.C. § 636(a)(36)(G)(i).

34. While PPP loans were guaranteed under similar terms, conditions, and processes as traditional SBA 7(a) loans, certain terms were unique to PPP. Collateral and personal guarantees were not required. 15 U.S.C. § 636(a)(36)(J). All loans were to be processed by private lenders under delegated authority, and lenders were permitted to rely on certifications of the borrower to determine borrower eligibility and use of loan proceeds. 15 U.S.C. § 636(a)(36)(F)(ii)(I)–(II). There were no fees collected by the administrator of the loan. 15 U.S.C. § 636(a)(36)(H).

35. There were two rounds of PPP loans. The first draw's eligibility was slightly broader than the second. In the first draw, qualifying businesses were only required to have 500 or fewer employees, or an industry specific employee cap. 15 U.S.C. § 636(a)(36)(D)(i).

36. The second draw had the same general loan terms as the first draw. However, the second draw placed stricter limitations on the number of employees. 15 U.S.C. § 636(a)(37); *see generally,* SMALL BUS. ADMIN., SECOND DRAW PPP LOAN (2022). To qualify for the second draw, the businesses were required to have (1) previously received the first draw PPP loan and have used (or planned to use) the full amount only for authorized uses, (2) no more than 300 employees, and (3) demonstrated at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. 15 U.S.C. § 636(a)(37)(A)(iv)(I). The second draw also expanded the uses of the loan. The loan could be used for worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism in 2020, certain supplier costs, and expenses for operations. 15 U.S.C. §§ 636(a)(37)(A)(iii) (citing definitions in 15 U.S.C. § 636m(a)) and 636(a)(37)(J)(iii). These fund uses were in addition to the uses laid out in the first draw.

37.     Under the CARES Act, SBA delegated authority to lenders to make and approve PPP loans. 15 U.S.C. § 636(a)(36)(F)(ii)(I). To approve the loans, the lenders confirmed (1) receipt of borrower certifications in the PPP Borrower Application, (2) receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes, and (3) the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application. 85 Fed. Reg. 20815 (April 15, 2020) (to be codified in 13 C.F.R. pt. 120).

38.     Once the above steps were completed, the lender submitted the application information to the SBA electronically to obtain a loan number. 86 Fed. Reg. 3692, 3709(C)(9) (Jan. 14, 2021). After this, the lender notified the SBA of the loan disbursement by completing the SBA Form 1502 with loan status information. *Id.* at (C)(10); *see* OFF. OF FIN. PROGRAM OPERATIONS, SBA FORM 1502 AND INSTRUCTIONS.

39.     If the loans were used for unauthorized purposes, the SBA required the borrower to repay those amounts. If the funds were knowingly used for unauthorized purposes, the borrower was subject to additional liability, including civil or criminal fraud charges.

40.     The PPP was attractive to businesses (and likewise susceptible to rampant fraud) because the PPP offered full loan forgiveness if certain conditions were met.

41.     Under the first draw, a business was eligible to qualify for full loan forgiveness if the loan proceeds were spent on payroll costs and other eligible expenses, 15 U.S.C. § 636m(b), employee and compensation levels were maintained, § 636m(d)(2), and at least 60% of the proceeds were spent on payroll costs. § 636m (d)(8); *see generally* SMALL BUS. ADMIN., PPP LOAN FORGIVENESS (2022).

42. Under the second draw, forgiveness requirements largely mirrored the first draw. 15 U.S.C. § 636(a)(37)(J)(ii).

43. Once the borrower submitted the PPP Loan Forgiveness Application to its lender, the lender had 60 days to review and issue a decision to the SBA. 15 U.S.C. § 636m(g). If the lender decided the borrower was entitled to loan forgiveness, the lender requested payment from the SBA, which then remitted the appropriate forgiveness amount to the lender no later than 90 days after receiving lender's decision. 15 U.S.C. § 636m(c)(3). Borrowers were responsible for any remaining balance left unforgiven. *See* 15 U.S.C. § 636(a)(36)(K)–(M).

## FACTUAL BACKGROUND

44. Defendants fraudulently obtained $13,439,910.00 in PPP loans by knowingly concealing from the United States the affiliation of its entities. In so doing, Defendants underrepresented their headcount by thousands, if not tens of thousands of employees.

45. Despite the clear interconnectedness to related entities, which rendered Defendants ineligible for PPP loans, Defendants repeatedly ignored the PPP's foreign-affiliate regulations and drastically underrepresented the number of employees across entities. By concealing the extent of their foreign affiliates, they were able to obtain millions in PPP loans. Defendants were well aware of the need to include their myriad of foreign entities in headcounts for their PPP applications but avoided that obligation to obtain millions of US government dollars.

### *Companies Applying for PPP Loans Must Certify Their Eligibility, Counting Both Their Employees and Those of All Domestic and Foreign Affiliates*

46. To qualify for PPP funds, a business must "employ[] not more than the greater of," 500 employees, or "if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern . . . operates." 15 U.S.C. § 636(a)(36)(D)(i)(I)–(II).

47.    Employees, for purposes of determining a headcount include "individuals employed on a full-time, part-time, or other basis." 15 U.S.C. § 636(a)(36)(D)(v); 13 C.F.R. § 121.106(a). "This includes employees obtained from a temporary employee agency." 13 C.F.R. § 121.106(a).

48.    A borrower must calculate the total number of employees for purposes of eligibility. *See* 15 U.S.C. § 636(a)(36)(D)(i).

49.    When calculating the number of employees for determining PPP eligibility, the business entity must count, not only its own employees, but those of "***all of its domestic and foreign affiliates.***" 13 C.F.R. § 121.103(a)(6) (emphasis added). An entity over its employee cap, including both domestic and foreign affiliate employees, is ineligible for the PPP loan. 85 Fed. Reg. 30835 (May 21, 2020). However, if an entity did not include foreign employees in the employee headcount, the SBA would not deem the entity ineligible for a PPP loan if (1) the entity filed before May 5, 2020, and (2) had less than 500 employees whose principal place of residence was the United States. *Id.*

50.    PPP's affiliation rules were applicable to all participants. *See* 13 C.F.R. § 121.103. Under the general principles, entities are considered affiliated if one entity controls or has the power to control the other entity. 13 C.F.R. § 121.103(a)(1). This provision also applies when a third party controls two or more entities. *Id.* Whether this control is in fact exercised is irrelevant, the mere ***existence*** of control is operative. *Id.* Indirect control of an entity through a third party may also be deemed affiliation. 13 C.F.R. § 121.103(a)(4). The SBA will look at the "totality of the circumstances," and may determine that an affiliation exists even when no single factor is fully satisfied. 13 C.F.R. § 121.103(a)(5).

51.     The SBA has multiple tests that are used to determine affiliation. 13 C.F.R. § 121.103(c)–(g). The tests include (1) affiliation based on stock ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on common management; (4) affiliation based on identity of interest; and (5) affiliation based on the newly organized concern. 13 C.F.R. § 121.103(c)–(g).

52.     Relevant here, affiliation based on stock ownership arises where an individual or entity owns, controls, or has the power to control 50% or more of the concern's voting equity. 13 C.F.R. § 121.103(c)(1). Such a majority owner is deemed to control the entity. *Id.* A presumption of control may also arise where two or more minority owners (individuals or entities) each owns, controls, or has the power to control minority holdings that are equal or approximately equal in size, and the aggregate of these minority holdings is large as compared with any other stock holding. 13 C.F.R. § 121.103(c)(2). If no individual or entity is determined to control, the SBA will deem the Board of Directors and CEO or President to be in control of the business. 13 C.F.R. § 121.103(c)(3).

53.     Also relevant here, affiliation based on "identity of interest" arises between "individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships)." 13 C.F.R. § 121.103(f). Specifically, entities owned by married couples, parents, siblings, and children "are presumed to be affiliated with each other if they conduct business with each other." 13 C.F.R. § 121.103(f)(1). Conducting business with each other includes joint ventures or sharing or providing loans, resources, equipment, locations or employees with one another. *Id.*

54.     Again, the SBA determines the size of a business by counting its "employees . . . **and all of its domestic and foreign affiliates**," 13 C.F.R. § 121.103(a)(6) (emphasis added), including temporary employees. 13 C.F.R. § 121.106(a).

### *Cosmax's US Entities Fraudulently Applied for and Received PPP Loans Without Full Disclosure of Their Foreign Affiliates*

55.     The three US entities collectively submitted four applications for PPP loans, improperly obtaining a total of **$13,439,910.00** from the Government.

56.     On April 14, 2020, Cosmax NBT USA received approval for $1,418,800.00 in PPP funds (hereinafter "NBT USA Loan").

57.     On April 28, 2020, NuWorld received approval for $5,249,510.00 in PPP funds (hereinafter "NuWorld loan").

58.     On May 1, 2020, Cosmax USA received approval for $4,771,600.00 in PPP funds (hereinafter "first Cosmax USA loan").

59.     Finally, on March 28, 2021, Cosmax USA received approval for an additional $2,000,000.00 in PPP funds (hereinafter "second Cosmax USA loan").

60.     Below is a chart containing the loan applications at issue.

| Loan | Approval Date | Loan Amount | Forgiveness Date | Principal Forgiven | Interest Forgiven |
|---|---|---|---|---|---|
| Cosmax NBT USA | 04/14/2020 | $1,418,800.00 | Unknown | $1,418,800.00 | $17,893.00 |
| NuWorld | 04/28/2020 | $5,249,510.00 | 09/09/2021 | $5,249,510.00 | $70,722.57 |
| 1st Cosmax USA | 05/01/2020 | $4,771,600.00 | 10/27/2021 | $3,097,196.00 | $45,855.71 |
| 2nd Cosmax USA | 03/28/2021 | $2,000,000.00 | 06/13/2022 | $2,000,000.00 | $24,444.44 |
| | | $13,439,910.00 | | $11,765,506.00 | $158,915.72 |

61.     As part of the PPP application process, companies are required to disclose all their affiliates. Specifically, question three of the PPP application asks, "[i]s the Applicant or any owner

of the Applicant an owner of any other business, or have common management with, any other business?"

62.     This reporting requirement also includes SBA Form 3511, a worksheet that must be completed when a borrower's loan application indicates that it may have affiliate entities. It requires the disclosure of all the borrower's affiliates and directs the borrower to the relevant regulatory guidelines in 13 C.F.R. § 121.103.

63.     Once completed, the borrower submitted Form 3511 to its loan servicer, who in turn submitted the information to the SBA's PPP forgiveness platform. The borrower's submission in Form 3511 allowed the SBA "to evaluate the borrower's certification on its PPP Loan Application that it was eligible to receive a PPP loan[.]"

64.     Failure to disclose affiliates had an impact on the SBA's determination on loan eligibility, loan amount, and forgiveness.

65.     Here, Defendants either woefully underrepresented their affiliates or blatantly failed to disclose any affiliates in their PPP applications. When applying for the NuWorld loan and both Cosmax USA loans, for example, Defendants answered question three in the negative, failing to disclose affiliates.

66.     While all three applications disclosed that they were owned by Cosmax West, neither NuWorld nor Cosmax USA disclosed the existence of the other entity in their loan applications.

67.     As part of the forgiveness process, NuWorld subsequently submitted Form 3511. While NuWorld did disclose that it was affiliated with Cosmax USA by virtue of their common ownership in that form, it failed to disclose the larger networks of companies connected to its parent company.

16

68.     Although Relator was not involved in the PPP process with Cosmax NBT USA, upon information and belief, similar misrepresentations were made in its application with regard to affiliates.

69.     For this reason alone, all four Cosmax PPP applications contained material omissions and false claims. As discussed in the next section, these certifications were not only false, but they significantly misrepresented the overall corporate structure of Defendants.

### *Cosmax is Comprised of a Host of Entities All Under Ownership Control of Its Korean Parent Companies*

70.     The vast network of corporate entities goes well beyond the corporate Defendants identified in this Amended Complaint.

71.     Of the five SBA affiliation tests referenced above, ownership-control is the most straightforward—finding control where an entity owns half or more of another. This simple test is enough to establish three distinct trees of control, one under each of the Korean parent companies.

72.     The three US entities that illegally received PPP funding sit in the two largest control trees: that of Cosmax, Inc. and Cosmax NBT.

73.     While the vast employee counts of these two trees are enough to exceed applicable headcount thresholds on their own, as discussed in later sections, another control test shows that all three trees are in fact connected at the root.

74.     The largest ownership-control tree extends from Cosmax, Inc. Under this parent, other entities sit, including two of the US entities, Cosmax USA and NuWorld, as well as perhaps the largest company by number of employees, Cosmax China, Inc. (hereinafter "Cosmax China").

75.     Cosmax, Inc. owns 50% or more of the stock in each of these companies, making all the entities affiliates for the purposes of PPP.

76.     The degree of ownership-control is by no means a close-run issue. Defendants did not accidentally overlook this fact or make a mistake in their disclosures because of wide fluctuations.

77.     The second largest ownership-control tree extends from Cosmax NBT. Cosmax NBT has ownership-control over other entities, including the final PPP recipient, Cosmax NBT USA.

78.     Like the other two South Korean parent companies, Cosmax BTI has ownership-control over its own subsidiaries, four in total. Again, half are owned outright by their parent, making corporate knowledge of ownership-control clear.

79.     While Cosmax BTI itself does not have ownership-control over any of the PPP recipients, its employees and those of its subsidiaries are nonetheless plainly relevant.

80.     As discussed in the following section, another SBA control test demonstrates that this complex web of Cosmax entities is not three standalone chains of affiliates but rather is one unified group.

### *Under the SBA's Identity of Interest Control Test, All Cosmax Entities Act as a Single Unified Entity*

81.     Delving further into the convoluted interaction between the various Cosmax entities, it becomes clear that this is truly a monolith entity, rather than numerous distinct entities under three unrelated parent companies.

82.     All entities—regardless of their parent company—share resources and liabilities.

83.     Employees are routinely used across entities.

84.     Affiliation based on identity of interest arises between "individuals or firms that have identical or substantially identical business or economic interests (such as family members,

individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships)." 13 C.F.R. § 121.103(f).

85.     Specifically, entities owned or controlled by married couples, parents, siblings, and children "are presumed to be affiliated with each other if they conduct business with each other." 13 C.F.R. § 121.103(f)(1). Conducting business with each other includes joint ventures or sharing or providing loans, resources, equipment, locations or employees with one another. *Id.*

86.     This presumption can be rebutted "by showing a clear line of fracture between the concerns." *Id.*

87.     Presumptions can also arise under economic dependence, where an entity derived 70% or more of its receipts from another entity over three consecutive fiscal years. 13 C.F.R. § 121.103(f)(2). The economic dependence presumption is rebutted where the dependent entity is not solely dependent on the other entity. 13 C.F.R. § 121.103(f)(2)(i).

88.     Cosmax operates as a unified entity. It even speaks of itself in these terms:

> COSMAX *Group* is a global no.1 research, development and production ***business group*** for cosmetic and health functional food products. . . . COSMAX *Group*, built around the global leader of K-Beauty, COSMAX, consists of COSMAX NBT and COSMAX BIO. . . . *[W]e are interwoven* and focused through each field and integration . . . From planning, research and development of cosmetics, to health functional foods production, quality control and marketing support, the ***COSMAX Group moves forward, shoulder to shoulder,*** beside wide range of partners in global markets.[1]

89.     In its own terms, there is no "clear line of fracture" between Korean parent companies. There is no fracture between the cosmetics businesses or the nutritional supplements businesses. And there is no fracture between parents and subsidiaries.

90.     Defendants routinely use the funds of one entity to prop up another. Often, these economic dependencies cross over the three ownership-control trees outlined in the prior section.

---

[1] https://cosmax.com/new/en/good/sub_good_Ol_group.asp (emphasis added) (last accessed 11/29/2022).

The South Korean parent companies' annual corporate filings detail various financial dealings with related parties, including sales, purchases, income, expenses, receivables, liabilities, and borrowing. Below are just some examples of the companies conducting business with each other:

a.  In fiscal year 2020, Cosmax, Inc. provided several loan guarantees to related entities. In addition to numerous guarantees for its own subsidiaries, it also guaranteed loans for Cosmax BTI and a BTI subsidiary, Cosmax Bio Co., Ltd.

b.  In fiscal year 2019, Cosmax NBT's filings show eleven separate guarantees on behalf of Cosmax, BTI, thirteen in fiscal year 2020, and seventeen in fiscal year 2021.

c.  Cosmax BTI in turn guaranteed loans for Cosmax NBT and Cosmax NBT USA in fiscal year 2019.

d.  Cosmax NBT provided significant collateral to Cosmax West, a Cosmax, Inc. subsidiary, in fiscal years 2019, 2020, and 2021.

e.  In fiscal year 2020, Cosmax BTI reported numerous sales to Cosmax, Inc. and ten subsidiaries thereof, as well as sales to Cosmax NBT and five of its subsidiaries. These include all three US entities.

f.  Cosmax, BTI reported purchases from only three related entities in fiscal year 2020: the three US entities.

g.  Cosmax BTI lists "[s]ignificant other income and other expenses" from Cosmax, Inc. subsidiaries, Cosmax USA and NuWorld, in fiscal years 2019, 2020, and 2021.

91.  Similar financial dealing, including sales, purchases, income, expenses, receivables, liabilities, and borrowing, across entities and parent groups can be seen in fiscal years 2019 to 2021 for all three Korean parent companies.

92.     In their own filings, which meticulously report interactions between "related entities," Defendants demonstrate their own understanding that Cosmax is a unified venture with an identity of interest. These filings paint a clear picture of Defendants sharing "identical or substantially identical business or economic interests," within the meaning of 13 C.F.R. § 121.103(f).

93.     Relator has personal knowledge of major financial support by Cosmax, Inc. to Cosmax USA.

94.     In 2013, Cosmax, Inc. guaranteed a $20,000,000.00 loan to Cosmax USA.

95.     In 2014, Cosmax, Inc. guaranteed another $15,000,000.00 loan to Cosmax USA.

96.     The same year, Cosmax USA received an additional $5,000,000.00 loan, again guaranteed by Cosmax, Inc.

97.     Cosmax, Inc. continues to sustain Cosmax USA through large cash infusions.

98.     Upon information and belief, Cosmax USA's dependence on its parent company is emblematic of the financial dependencies across Cosmax entities.

99.     This internal financial support not only shows affiliation between the entities, but also undercuts Defendants' need for PPP altogether. Borrowers were required to certify in good faith their economic need for PPP loans. 15 U.S.C. § 636(a)(36)(G)(i)(I). A billion-dollar business with access to massive stores of capital across entities can hardly have a good faith basis for such applications.

100.    Defendants also routinely shared employees and other resources across entities.

101.    From his work in payroll and other HR matters, Relator has a keen view into these issues.

21

102.   For instance, Relator is aware that Cosmax NBT USA and NuWorld employees are on Cosmax USA's payroll, 401k plan, and health insurance, despite the fact that those companies have different parent companies and are on opposite sides of the cosmetics and nutritional supplements businesses respectively.

103.   It is common practice for Defendants to transfer employees between entities but keep them on the payroll of their previous entity-employer.

104.   Similarly, many employees have job responsibilities across entities, while only being on the payroll of one entity.

105.   Relator was one such employee. While on the payroll of Cosmax USA, he oversaw all HR matters for Cosmax USA and NuWorld, including terminating and recruiting individuals for both entities.

106.   While Relator's insight into these practices is limited to his vision from within HR at the US entities, upon information and belief, such practices occurred across all of Defendants' entities.

107.   Defendants routinely paid Korean nationals out of Korean entities while having those employees work in the US under B1 visas.

108.   There is no divide between employees or resources across Defendants' entities, demonstrating an identity of interest.

109.   All of Cosmax's entities share an identity of interest. They have economic codependence, widely share employees, and are under the common direction and control. As such, all the entities should be treated as affiliates for purposes of the PPP certifications as well as PPP headcount requirements.

### _Defendants Flouted Headcount by Disregarding Affiliation Rules and Undercounting Employees_

110. Defendants made material misrepresentations in their PPP applications, without which they would have exceeded the relevant headcount caps by leaps and bounds. Even stopping short of looking at all of the entities as affiliates, Cosmax USA and NuWorld exceeded the cap by **_thousands_** of employees under the ownership-control tree of Cosmax, Inc. This is the case when merely accounting for a single affiliate, Cosmax China.

111. Similarly—albeit by a less ridiculous margin—Cosmax NBT USA also exceeded its cap when looking to its Cosmax NBT ownership-control affiliates. Looking at the larger picture—as one should—with all entities connected through ownership-control and/or identity of interest, Defendants egregiously underrepresented employee headcount.

112. To qualify for PPP funds, a business must have no more than 500 employees or qualify for an industry specific cap. 15 U.S.C. § 636(a)(36)(D)(i). These industry specific limits are the North American Industry Classification System ("NAICS") codes. 13 C.F.R. § 121.201.

113. Defendants Cosmax USA and NuWorld self-selected NAICS codes with an employee limit of 1,250, while Cosmax NBT USA is believed to have self-selected a NAICS code with an employee limit of 1,000.[2]

114. The second draw placed stricter limitations on the number of employees. 15 U.S.C. § 636(a)(37). The second draw was limited to businesses with no more than 300 employees, without regard to differing NAICS code caps. 15 U.S.C. § 636(a)(37)(A)(iv)(I).

---

[2] Across Cosmax USA and NuWorld's various loans, Defendants utilized code 325620, for Toilet Preparation Manufacturing (*i.e.*, toiletry manufacturing) or 325412, for Pharmaceutical Preparation Manufacturing. Cosmax NBT USA used code 325411, for Medicinal and Botanical Manufacturing. Relator does not opine on the propriety of this NAICS code's applicability to Defendants, as—assuming *arguendo* this larger employee cap is proper—Defendants nonetheless exceeded this cap.

115. Employees, for purposes of determining a headcount, include "individuals employed on a full-time, part-time, or other basis." 15 U.S.C. § 636(a)(36)(D)(v); 13 C.F.R. § 121.106. "This includes employees obtained from a temporary employee agency." 13 C.F.R. § 121.106.

116. A borrower must calculate the total number of employees for purposes of eligibility. *See* 15 U.S.C. § 636(a)(36)(D)(i).

117. In the first draw, the three US entities reported the following headcount figures: (1) Cosmax NBT USA: 121, (2) NuWorld: 271, and (3) Cosmax USA: 215.

118. However, Defendants failed to include temporary workers in these counts, despite improperly using these workers to inflate wages for purposes of calculating the loan amount available to them.

119. The number of temporary workers was by no means insignificant. NuWorld, at the height of its reliance on temporary workers, utilized as many as 600 to 700 temporary workers at any given time. While that number has significantly decreased, NuWorld still utilizes hundreds of temporary workers.

120. Relator has personal knowledge of temporary workers being used at Cosmax USA and, upon information and belief, similar practices were used at Cosmax NBT USA.

121. NuWorld used approximately 312 temporary workers, while Cosmax USA used approximately 251 temporary workers. This represents approximately 563 workers that were not disclosed by Defendants. Relator is unaware of how many temporary workers are utilized by Cosmax NBT USA; however, based on the numbers utilized at the other two domestic entities, it is believed that there are potentially hundreds of additional unreported temporary workers.

122.    In an email with a senior HR employee at Cosmax, Inc., Relator inquired into the employees of other entities. Relator stated that he is aware of around 3,000 Cosmax China employees.

123.    Relator then asked if this meant that total Cosmax employees were approximately 5,000, when including Cosmax, Inc. and the US entities. He was informed that there were additionally 208 employees at PT Cosmax Indonesia, 160 at Cosmax Thailand Co., Ltd., and 107 at Cosmax NBT Australia Pty. Ltd. This is an additional 3,475 employees that were not disclosed in PPP applications.

124.    Relator has also obtained employee counts for the three Korean parent entities by reviewing company profiles. Those reports show the following: (1) Cosmax, Inc.: 1,153, (2) Cosmax BTI, Inc.: 208, and (3) Cosmax NBT, Inc.: 566. This is an additional 1,927 employees.

125.    When added to temporary employees and those disclosed in internal emails, Relator is conservatively aware of approximately *5,965* undisclosed employees. When added to US employee counts for all three entities, the total known employee count across all affiliates is approximately 6,572, a staggering *5,322 employees over the larger NAICS cap.*

126.    While Relator is not aware of the specific employee count at the precise moment of each PPP application submission, upon information and belief, any fluctuation over time did little to mitigate the regulatory impact. With such a massive overage of undisclosed employees, Defendants undeniably had thousands of unaccounted-for employees at the time of their respective applications.

127.    Defendants have also made different headcount representations to other government agencies that further call into question the validity of the headcount submissions in their PPP applications.

128.     In reality, this already staggering number of known employees falls well short of the likely total.

129.     Admittedly, Cosmax West and East, as holding companies, are likely to have only a nominal number of employees. However, that leaves numerous operating companies with meaningful employee counts.

130.     Looking purely to ownership-control, the most clear-cut test, Cosmax USA and NuWorld have a total of approximately 5,570 employees across Cosmax, Inc. based affiliates. Again, that does not include the other subsidiaries under the ownership control of Cosmax, Inc.

131.     Similarly, Cosmax NBT USA also, upon information and belief, exceeded the cap based on the ownership-control test alone. Of the seven NBT entities, three have known employee counts totaling 794. This is just 206 employees shy of its 1,000 employee cap under their selected NAICS code, a gap easily closed by the remaining four entities with unknown employee totals and Cosmax NBT USA's unknown number of temporary employees.

132.     Defendants' fraud is even more severe under the stricter headcount rules for the second PPP draw. There, the cap was firmly set at 300 employees, without regard to differing NAICS code caps. 15 U.S.C. § 636(a)(37)(A)(iv)(I). Cosmax USA reported 232 employees.

133.     At that time, merely adding NuWorld as an affiliate would have exceeded the limit, without including temporary workers for those entities.

134.     NuWorld's Form 941 filings from the time period of the second Cosmax USA loan—the second quarter of 2021—show an additional 202 employees.

135.     Defendants were well aware of this employee count across entities and well aware of PPP's affiliation and headcount requirements. Despite this, Defendants massively underrepresented their employee numbers to fraudulently obtain millions in forgivable loans.

### ***Defendants Routinely Pushed for Higher PPP Funding and Forgiveness***

136.    From application through forgiveness, Relator faced constant and extreme pressure from Defendants, primarily through Cosmax USA's CFO, and Cosmax USA's Finance Director, to obtain maximum loan amounts and have those loans forgiven.

137.    On September 30, 2020, Relator received an email from a then officer of Cosmax USA stating, "PPP loan[s] must be forgiven for the (sic) both entities. When can it be confirmed and known to be forgiven? [CFO] wants to book it in Q4 2020." Relator responded:

> Not sure what you mean by "must be forgiven". There is no guarantee in this. So far, no company in USA has had their loan forgiven and timing is still very fluid as the government and the bank try to work it all out. The process still has a lot of uncertainty and it is not known how slow it will move.
>
> Due to the amount of our loans, my expectation is that we will get a lot of scrutiny from our banks and SBA . . . which translates into more time.
>
> This is a large project with many nuances . . . it will take time to get through it. My biggest concern is not timing, but to get the loan forgiven to the largest extent possible.

138.    Throughout these communications management pressured Relator to apply for significant PPP loans without regard to Relator's comments on the actual regulatory landscape.

139.    Over the course of these discussions, it became clear that others in management were suspicious of the propriety of these loans and sought to distance themselves.

140.    Not only did Relator face pressure to obtain the loans and subsequent forgiveness, but management also directed that the loan amounts be inflated.

141.    Both Cosmax USA and NuWorld impermissibly included wages paid to temporary workers in their calculations for the loan amount, despite the fact that these workers were not employees for purposes of loan amounts.

142. Moreover, Defendant impermissibly excluded these workers from headcounts, while using their wages to boost the overall loan amount. The decision to include temporary workers in the loan amount calculation came from management.

143. On December 10, 2020, Relator received an email from Cosmax USA's PPP contact at PNC, Julie Hill. Hill stated, "[t]he outstanding loan amount appears to be higher than what the payroll documents support." Hill followed up with Relator the next month noting that the issue was related to wages for temporary workers that were not listed as employees on Cosmax USA's taxes, and that "it was concluded that they were employed by an independent agency that may have also applied for PPP relief for the same employees."

144. As a result, a portion of the first Cosmax USA loan was not forgiven. Despite this, of the full $4,771,600.00 obtained under the first Cosmax USA loan, the Government forgave $3,097,196.00 in principal and $45,855.71 in interest, on October 27, 2021.

145. Despite similar impropriety in NuWorld's application, the full amount of that loan was forgiven. On September 9, 2021, the Government forgave $5,249,510.00 in principal and $70,722.57 in interest on the NuWorld loan.

146. While Relator was only involved in the loans for NuWorld and Cosmax USA, upon information and belief, similar misrepresentations were made in Cosmax NBT USA's loan application. Upon further information and belief, Cosmax NBT USA's loan was fully forgiven.

147. On June 13, 2022, the Government forgave $2,000,000.00 in principal and $24,444.44 in interest on the second Cosmax USA loan.

148. Relator repeatedly informed management of this misrepresentation, in regards to both Cosmax USA and NuWorld; however, those concerns fell on deaf ears, and Defendants took no action to remedy the known overpayment to NuWorld.

149.    On August 9, 2021, Relator described the issue in an email to other employees at Cosmax USA, saying that the portion of the loan attributable to temporary labor was ineligible and must be either repaid or converted to an unforgiven loan. An officer of Cosmax USA responded "[j]ust to make sure, regarding PPP loan being ineligible, is it Nu[W]orld's or Cosmax[]USA's?"

150.    This demonstrated Defendants' understanding that NuWorld's application contained the same inaccuracies as Cosmax USA. Relator clarified this connection saying, "[t]his is the loan in for Cosmax USA entity. Forgiveness on the loan for NuWorld entity is so far proceeding at the full amount."

151.    Despite this, no action was taken. The only response was an officer saying, "[t]hank you for providing detail."

152.    From the outset, Defendants pressured Relator to apply for and seek forgiveness of PPP loans. This even included directives to inflate payroll to garner larger loans. Even after some of these issues were spotted and again raised internally by Relator, no action was taken.

153.    Defendants fraudulently obtained $13,439,910.00 in PPP loans by concealing the affiliation of its entities. The vast majority of these loan amounts were forgiven in full.

154.    Defendants underrepresented their headcount by thousands, if not tens of thousands of employees. All entities were under the ownership control of the three Korean parent companies at the time Defendants applied for PPP loans.

155.    Moreover, all entities shared an identity of interest making them a unified network of affiliates. At all times, these fraudulent loan applications and subsequent forgiveness applications were orchestrated and directed by Cosmax's senior leadership.

## **CONCLUSION**

156.    Defendants fraudulently obtained $13,439,910.00 in PPP loans by concealing the affiliation of entities. Defendants underrepresented their headcount by thousands, if not tens of thousands of employees.

157.    Defendants have schemed the system, bilking the government out of millions intended to support small domestic businesses crippled by economic downturn.

### **COUNT I**
### **Violation of False Claims Act (Presenting and Causing False Claims)**
### **(31 U.S.C. § 3729(a)(1)(A))**

(All Defendants)

158.    Relator incorporates all prior and subsequent paragraphs herein by reference.

159.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

160.    Defendants presented or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, by applying for and receiving PPP loans, and by applying for and receiving forgiveness on those loans, when Defendants were ineligible for those loans and for their forgiveness, as Defendants exceeded applicable employee caps.

161.    Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

162.    The United States sustained damages because of the wrongful conduct of the Defendants.

### **COUNT II**
### **Violation of False Claims Act (False Statements Material to False Claims)**
### **(31 U.S.C. § 3729(a)(1)(B))**

(All Defendants)

163.    Relator incorporates all prior and subsequent paragraphs herein by reference.

164.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

165.     Defendants made, used, and caused to be made or used false records or statements—*i.e.,* the false certifications and representations made and caused to be made by such Defendants when submitting the false PPP applications and the false certifications and representations made by such Defendants in submitting false forgiveness applications—to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

166.     The false certifications and representations made by Defendants were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of such statements and actions.

167.     The false certifications and representations made and caused to be made by Defendants were material to the Government's payment of the false claims.

168.     Defendants made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

169.     The United States sustained damages because of the wrongful conduct of the Defendants.

### COUNT III
**Violation of False Claims Act (Conceal Obligation to Pay)**
**(31 U.S.C. § 3729(a)(1)(G))**

(All Defendants)

170.     Relator incorporates all prior and subsequent paragraphs herein by reference.

171.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

172.    Defendants knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

173.    Defendants did so with actual knowledge or with reckless disregard or deliberate ignorance.

174.    The United States sustained damages because of the wrongful conduct of the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of himself and the United States of America pray this Court as follows:

1.    Find that each Defendant violated the False Claims Act based on the causes of action alleged herein.

2.    Order that Defendants cease and desist from violating the False Claims Act.

3.    Enter judgment against each Defendant and award the United States treble damages based on the amount of damage suffered by the United States.

4.    Award the United States civil penalties between $5,000 and $10,000 for each violation of 31 U.S.C. § 3729, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 890 (1990).

5.    Award Relator the maximum amount allowed under 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law.

6.    Award Relator reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d) and/or any other applicable provision of law.

7.    Grant any other relief as required in the interest of justice.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury in this action on all issues so triable.

Respectfully submitted this the 5th day of May 2025.

FLANNERY | GEORGALIS, LLC

Chris N. Georgalis (OH: 0079433)
1375 E. 9th Street, 30th Floor
Cleveland, OH 44114
chris@flannerygeorgalis.com
(216) 466-0169

Colin J. Callahan (PA: 328033)
436 Seventh Avenue Koppers Building, Ste. 2100
Pittsburgh, PA, 15219
ccallahan@flannerygeorgalis.com
(412) 213-4246

Gavin A. Bell (NC: 54759)
227 W. Trade Street
Carillon Tower | Suite 950
Charlotte, NC 28281
gbell@flannerygeorgalis.com
(704) 420-7549

*Counsel for Plaintiff-Relator*